FIRST NORTHWEST INDUSTRIES OF AMERICA, INC., SUCCESSOR IN INTEREST TO SEATTLE SUPERSONICS CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8899–73.     Filed September 6, 1978.

*Woolvin Patten* and *Rodney J. Waldbaum,* for the petitioner.
*Darrell D. Hallett* and *Robert J. Chicoine,* for the respondent.

STERRETT, *Judge:* Respondent determined deficiencies in petitioner's corporate Federal income taxes for its fiscal years ended May 31, 1969 and 1970, in the amounts of $53,808.21 and $165,302.11, respectively.[1] This controversy stems from petition-

---

[1] In his notice of deficiency dated Oct. 17, 1973, respondent determined deficiencies for the fiscal years ended May 31, 1969 and 1970, in the amounts of $10,014 and $129,798, respectively. Petitioner for its short taxable year, Nov. 1, 1967, to May 31, 1968, reported a loss (after deduction of a net operating loss deduction) of $336,536. Respondent's determination of increase in income, for this short year, was $319,439, resulting in a revised loss of $17,097. Therefore, no deficiency was asserted for this

er's purchase, in 1967, of a National Basketball Association (hereinafter NBA) expansion franchise, the Seattle SuperSonics (hereinafter sometimes referred to as Sonics or Seattle). The issues for decision involve the allocation, if any, and treatment of such purchase price among the rights and properties petitioner acquired and the treatment of moneys received by the Sonics upon entry in the league of subsequently admitted NBA expansion franchises.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner First Northwest Industries of America, Inc., a Washington corporation, having its principal place of business in Seattle, Wash., is the successor in interest to the Seattle SuperSonics Corp.[3] It filed its Federal corporate income tax returns for the years herein involved with the Internal Revenue Service Center, Ogden, Utah.

In the summer of 1949, the Basketball Association of America (BAA) merged with the National Basketball League (NBL) and

---

1968 short year.

By amendment to his answer filed June 22, 1976, respondent alleged and redetermined that said deficiencies for the fiscal years ended May 31, 1969 and 1970, be increased in the amounts of $43,794.21 and $35,504.11, respectively. Additionally, for the year ended May 31, 1968, respondent increased petitioner's income $129,598, readjusted its taxable income as revised to $112,501, but did not compute any tax.

[2]The parties have settled some of the peripheral issues as follows: (1) Petitioner concedes the following increases in its income.—

| Item | FYE May 31— | |
| --- | --- | --- |
| | 1969 | 1970 |
| Interest income | $1,603 | $3,086 |
| Playoff income | 60,906 | 21,763 |
| Insurance expense | 6,361 | 4,155 |

(2) Petitioner is entitled to imputed interest attributable to its expansion agreement of Jan. 24, 1967, at the rate of 5 percent per annum, compounded semiannually from Jan. 24, 1967, for the fiscal years ended May 31, 1969, and May 31, 1970.

[3]Initially, in January 1967, the enterprise was structured as a partnership, the Seattle Professional Basketball team. By agreement dated May 28, 1967, the partnership assigned all its assets and liabilities to the Seattle SuperSonics Corp., a Delaware corporation. On Oct. 7, 1967, a newly formed Washington corporation, Seattle Basketball Corp., issued its stock for all the assets and liabilities of the Delaware corporation; said shares were proportionately distributed in liquidation to the then shareholders of the Delaware corporation and it was then dissolved. On Aug. 14, 1969, the Washington corporation changed its name to First Northwest Industries of America, Inc. (First Northwest). On Oct. 10, 1969, a new corporation, Seattle SuperSonics Corp., was formed and on Oct. 27, 1969, all of First Northwest's basketball related assets were transferred to this newly formed corporation in exchange for all of its stock.

an association of 17 basketball teams became what is presently known as the National Basketball Association (NBA). In 1950, the NBA consisted of 11 teams, but by the end of 1954 the league was reduced to 8 teams.[4] A new franchise, Chicago, was added in 1961 and, after the Chicago franchise relocated in Baltimore, Md., the NBA in 1966 admitted a 10th franchise, again located in Chicago.

The operational rules of the NBA are set forth in its constitution and bylaws, and the general supervision of the association is carried out by the board of governors with each team having a representative on the board. The presiding officer of the board of governors and the administrative head of the NBA is the commissioner who is elected by the affirmative vote of three-quarters of the governors.[5] In 1963, Maurice Podoloff, the first commissioner of the BAA, retired as NBA commissioner and was succeeded by Walter Kennedy. Mr. Kennedy served as NBA commissioner until his retirement in 1975. The board and/or the commissioner has the authority to appoint committees to deal with league problems such as expansion, merger, player relations, officiating, merchandising, and television broadcasting.

A would-be member of the NBA initially files an application with the commissioner. This application is passed on to the expansion committee established to process and consider such applications and make its recommendation to the board. The granting of an NBA franchise requires the affirmative vote of three-quarters of the board. The commissioner, acting as an exofficio member of the expansion committee, has no vote with respect to the board's decision on said application.

At the November 21, 1966, NBA board of governors meeting a motion was passed which provided:

the NBA will expand over a period of four years, starting with the 1967–68 season, adding two cities each of the four years for a total of eight cities and that the following twelve cities, in alphabetical order, be considered: Atlanta, Cleveland, Dallas-Ft. Worth, Houston, Kansas City, Minneapolis, New Orleans, Phoenix, Pittsburgh, San Diego, Seattle, and Washington.

A 1966 market study indicated that Seattle might be the

---

[4] Boston, New York, Philadelphia, Syracuse, Ft. Wayne, Minneapolis, Rochester, and Milwaukee.

[5] The commissioner is responsible for implementing the NBA's constitution and bylaws and has the power to suspend employees of members and officials of the NBA, to impose fines, and to declare null and void any player transaction made between members of the league.

"hottest" prospect of all of them, and the NBA board of governors believed that basketball would succeed in Seattle. Additionally, the NBA owners envisioned an expansion program wherein the league would grow from 9 to 24 teams over a period of 10 years. Such expansion plans were flexible goals and, although no new franchises were granted in 1969, three franchises were granted in 1970.

On December 19, 1966, the NBA expansion committee sent a memo to the NBA board of governors recommending the following expansion plans for the 1967–68 season:

(1) Two new cities will be added to the NBA beginning with the 1967–68 season.

(2) A professional player pool will be created, from which *each* of the two new cities will draft a total of fifteen (15) players (three (3) from each of the ten NBA teams, for a grand total of thirty (30) players).

(3) Each of the existing ten NBA teams will protect seven (7) of its players on the active list.

(4) All players in excess of seven (7) will be placed in the professional player pool.

(5) A flip of a coin will determine which of the new cities gets first choice in the professional draft.

(6) After the first player has been selected from each of the ten clubs, each club has the right to protect one of its remaining players in the pool.

(7) In the 1967 college draft, the procedure for drafting will be as follows:

a. The first five (5) picks will be made by the five (5) lowest teams in consolidated percentage standing.

b. The two new cities will make the sixth and seventh picks, priority to be determined by a flip of a coin.

c. The next ten picks will be made by the ten existing NBA teams, the team with the sixth lowest consolidated percentage standing getting first pick (#8), and the others picking in succession.

d. The two new cities will take the next two picks.

e. From that point, all further picks will be in inverse order of the standing at the end of the 1966–67 season, with the two new cities drafting eleventh and twelfth.

\*     \*     \*     \*     \*     \*     \*

(8) If any NBA club has less than eleven (11) players on its active list, it cannot elect to protect a player after the first selection in the professional player pool draft. Active lists are frozen when the teams adopt this plan.

(9) The cost of a new franchise will be $1,500,000. Payments are to be made as follows: $500,000 when the new city is voted a member of the NBA; $500,000 on May 1, 1967, $250,000 on May 1, 1968 and $250,000 on May 1, 1969. It is suggested that $1,350,000 be allocated for players and $150,000 for franchise.

(10) No college draft choices may be sold by new clubs for a period of one(1) year from draft date.

(11) A player selected from the professional player pool may not return to the club placing the player in the pool until October 1, 1968.

At a special meeting of the board of governors on December 20, 1966, the board unanimously accepted (1) the recommendation that Seattle become the 11th member city of the NBA and (2) the expansion program for 1967–68, as presented by the expansion committee. The board's minutes reflect verbatim the expansion committee's 11-point recommendation, as described above, but add the following:

(12) The two new cities added to the NBA beginning with the 1967–68 season will not participate in any way in the 1968–69 expansion.

On January 10, 1967, at a special meeting of the NBA board of governors the board approved "the Expansion Committee's recommendation that membership in the NBA for Seattle be granted to Eugene V. Klein [Klein] and Samuel Schulman [Schulman],[6] for a total cost of $1,750,000, and that Seattle participate in the 1967–68[7] expansion program." The minutes also reflect San Diego's admittance into the NBA, to begin with the 1967–68 season, under the same conditions granted to Seattle.

By agreement dated January 24, 1967, a partnership, the Seattle Professional Basketball team,[8] petitioner's predecessor in interest,[9] became a member of the NBA. Under separate agreement of January 24, 1967, NBA membership in San Diego was granted to a partnership headed by Robert Breitbard. Although negotiations for these two NBA memberships were completely separate and apart from each other, both written expansion agreements contained identical material terms and conditions.

As found, the total price payable by petitioner under the terms of the expansion agreement was $1,750,000. In consideration of the grant of a franchise to operate a professional basketball team in Seattle and all the rights, privileges, and

---

[6]Klein was the principal negotiator in the preliminary meetings with the NBA representatives. However, both Klein and Schulman participated in the final negotiations that consummated the deal.

[7]The Sonics were admitted to the NBA for the 1967–68 season, and therefore this reference to participation in a 1967–68 expansion program we take as a typographical error. The record indicates that the board's intent was to refer to the 1968–69 expansion program.

[8]The respective interests of the partnership were as follows: Klein, 44 percent; Schulman, 44 percent; Irving Levin, 10 percent; and Harold Lipton, 2 percent.

[9]Unless otherwise specified, reference to petitioner's predecessors in interest shall be referred to as petitioner, the Sonics, or Seattle.

benefits attributable to a franchise holder and enjoyed by the grantor (the 10 established NBA franchises), the agreement specified that petitioner pay to each of the grantors the sum of $15,000, or an aggregate sum of $150,000. In consideration of the rights granted petitioner to participate in a special expansion draft, described *infra,* and the annual college draft to be held on or about May 1, 1967, the agreement specified that petitioner pay to each of the grantors the sum of $160,000 or an aggregate sum of $1,600,000. These payments were to be made in installments. Moreover, under the agreement of January 24, 1967, petitioner agreed to be bound by and adhere to all the terms and provisions contained in the constitution and bylaws of the NBA.

As we have found, the price for expansion franchises in the NBA was set by the board of governors following a recommendation from its expansion committee. The board believed that the purchase price paid by Seattle and San Diego was the highest price the market would bear for the aggregate of the rights and liabilities transferred to the new expansion franchises upon becoming members of the NBA. In 1967, the 10 then-existing franchises were willing to sell the players' rights acquired by Seattle (and San Diego) only if those rights were sold as part of a package which made the new franchises members of the NBA for all purposes. Moreover, Seattle was only interested in acquiring NBA membership if it could arrange a package deal which included player rights which, hopefully, would immediately render the Sonics reasonably competitive.

Therefore, in consideration of the payment of $1,750,000, petitioner acquired certain specified rights and assumed certain specified obligations as follows: (1) The right to select 15 of the then-available 50 veteran players in a special expansion draft, as described *infra,* and thereby acquire the exclusive bargaining rights within the NBA to these 15 basketball players; (2) the right to participate in the 1967 NBA college draft which gave Seattle and San Diego the right to split the following draft picks—6th and 7th, 18th and 19th, 30th and 31st, 42d and 43d, 54th and 55th, 66th and 67th, etc.; (3) the right to participate in all post–1967 NBA college drafts and to select college players in

an established order which is usually in the inverse order of the standing of teams in the previous season;[10] (4) the right and obligation to participate in the exhibition of NBA professional basketball by competing against other teams in the NBA;[11] (5) the exclusive right to exhibit NBA basketball within a 75-mile radius of Seattle and a corresponding prohibition of exhibiting basketball or relocating within 75 air miles of another NBA city; (6) the right to share ratably in all revenues derived from national broadcasting of NBA games, beginning with the 1967–68 season, subject to the team's providing space and location for television network personnel and equipment, the providing of electrical power to the network, and subject to the prohibition against advertising a product in the arena during the entire period of telecasting; (7) the exclusive broadcasting rights and the right to retain all revenues, if any, from the local broadcasting (television and radio) of the Sonics' games since such revenue is generated only through the efforts of the team's management and its ability to negotiate a favorable contract with local sources; (8) the right, subsequent to 1967, to share in revenues from NBA playoff games and NBA all-star games;[12]

---

[10]Under NBA draft procedure, after each team has the opportunity to select one player, a round is completed and the process begins again. Successive rounds for choosing players continue until a majority of the teams vote to terminate selection. Once drafted by an NBA team, that team has the exclusive NBA rights to negotiate for and acquire the services of the player it drafted. However, a team may relinquish its rights to a drafted player and/or sell or trade a specific drafting-assigned position to another team. Additionally, an expansion team, not competing in the season prior to an NBA college draft, may be awarded specific draft picks prior to some of the then-existing NBA teams, e.g., Seattle selecting 6th or 7th in the 1967 draft when, in the 1966–67 season, they were not in existence and did not have a league standing in relation to the then-existing 10 teams in the NBA. Obviously, the inverse order of drafting is designed to maintain a competitive balance in the NBA.

[11]In this regard, under the constitution, bylaws, and general practice of the NBA, gate receipts from regular season games are retained by the "home" team and are not shared with the "visiting" team as in other sports. During the regular season, each team is scheduled an equal number of "home" and "away" games. The visiting team has to bear the cost of its own travel expenses. Since the 1966–67 season, each team plays 82 regular season games. From 1966–67 through 1970, the league was divided into two divisions—the East and the West. At the end of each regular season, the top teams participate in a playoff to determine (1) the champion of each division and (2) the overall champion of the NBA.

[12]Each NBA team is required to pay 6 percent of its gross gate receipts from regular season home games, or $15,000 per season, whichever is greater, to the NBA as a capital consideration ($30,000 per season as of 1971). Each team engaging in annual playoff games is required to pay 45 percent of the receipts from home playoff games (after deduction for Federal, State, and city taxes on admissions, if any) to the NBA. The moneys so received by the NBA from playoff games are distributed as follows:

(a) To the payment of such player playoff pool as shall be fixed by the board of governors by a majority of all the governors.

(b) To the payment of traveling and maintenance costs of the contesting playoff teams.

(c) To the payment of fees and traveling and maintenance costs of the officials appointed for the games.

(9) the right to share in revenue derived from NBA promotional and merchandising activities; (10) the opportunity to promote and develop a reputation and goodwill in a portion of the United States which previously did not have a major league professional sports franchise and the rights to enjoy the benefits of NBA reputation and goodwill; (11) the rights and obligations of participating in a system which, through formal and informal rules and agreements, establishes, within the NBA, priority rights to basketball players and recognizes the exclusive NBA bargaining rights of each member franchise to its respective players;[13] (12) the right to share, ratably, in any proceeds from NBA expansion in 1968 and later years;[14] (13) all other rights, benefits, and obligations attendant to being a member of the NBA, including but not limited to the operational and managerial costs of maintaining an NBA team.

The special expansion draft provided for in the agreement of January 24, 1967, was conducted on May 1, 1967, pursuant to the following procedure. Each of the existing 10 NBA teams submitted a list of the active players on their rosters as of that

---

(d) The balance, if any, shall be distributed equally to the members and, for 1965–66 through 1972–73 seasons, said revenues were as follows—

| Season | All-star game | Playoff games | Total | Number of teams | Team share |
|--------|--------------|---------------|-------|-----------------|------------|
| 1965–66 | $31,755.52 | $192,322.93 | $224,078.45 | 9 | $24,897.61 |
| 1966–67 | 53,783.47 | 61,500.00 | 115,283.47 | 10 | 11,528.34 |
| 1967–68 | 11,350.08 | 376,455.01 | 387,805.09 | 12 | 32,317.09 |
| 1968–69 | 10,135.58 | 569,860.83 | 579,996.41 | 14 | 41,428.31 |
| 1969–70 | 14,301.98 | 857,272.31 | 871,574.29 | 14 | 62,255.30 |
| 1970–71 | 75,232.33 | 375,374.01 | 450,606.34 | 17 | 26,506.25 |
| 1971–72 | 21,474.80 | 617,166.68 | 638,641.48 | 17 | 37,567.14 |
| 1972–73 | 21,682.20 | 905,797.90 | 927,480.10 | 17 | 54,557.65 |

[13]NBA rules require that all players sign a formal contract for the current or preceding season before they may play for an NBA team. All formal player contracts shall be in the form prescribed and adopted by the NBA. The NBA commissioner has the power to disapprove and terminate the effect of a specific contract. Said uniform player contract in force during the 1967–68 NBA season contained a standard clause providing that by Sept. 1, following the last playing season covered by the contract, the NBA team could tender a new contract to its player and, if he failed to sign the contract, the then-existing contract was renewed for 1 year under the same terms and conditions as the prior contract except player compensation may be reduced by 25 percent. If a player were to play out his option, i.e., play 1 year without signing a new contract, any other team which signs the player for the subsequent year must compensate the team who lost the player. The uniform player contract further states that the NBA club, which has contracted with a specific player, shall have the right to sell, exchange, assign, and transfer to another professional basketball club the player contract and, if the player fails to report to his newly assigned team, subject said player to suspension. Thus, during 1967, the NBA controlled the mobility of its veteran players, at least within the NBA.

[14]The agreement did not specifically refer to this right. However, such reference was not necessary in order to convey this right to the Sonics since absent the prohibition of participation in the 1968–69 or subsequent expansion programs, the right to such participation passed to the Sonics as a part of its NBA membership rights. Moreover, as described *infra*, the Sonics did, in fact, participate in the 1968–69 NBA expansion program.

time to the league office. An active roster consisted of 12 players. Of the total number of players shown on these lists, each team was allowed to designate 7 of the players as being protected and not available for being drafted by Seattle or San Diego. The balance of each team's active roster was available for selection by either Seattle or San Diego. After the first player was selected from a team by Seattle or San Diego, that team could designate 1 of the remaining players as being thereafter protected if the team had 11 or more active players on its roster as of May 1, 1967. As the result of a flip of a coin, San Diego selected first and had all other odd-number selections, with Seattle picking second and having all other even-numbered selections. Each of the 10 NBA teams had 3 players selected from its active roster in the special expansion draft, Seattle and San Diego each selecting a total of 15 players.

Prior to this special expansion draft, the member NBA teams were not required to make any specific player on their rosters available for negotiation and acquisition to Seattle or San Diego. It was not known for certain, until the date of the draft, May 1, 1967, what specific players would be placed in the expansion pool. However, Seattle, through mock drafts and scouting information, was reasonably certain which 50 players out of the then–120 players in the NBA would not be protected.[15]

In May of 1967, the 1967 college draft was held and, pursuant to the expansion agreement of January 24, 1967, Seattle, the loser of the coin flip in the expansion draft, picked 6th with San Diego picking 7th; San Diego's next selection was the 18th, and Seattle's the 19th, pick in the draft. Thereafter, all subsequent selections, starting with the third round, were made in inverse order of the standings of the teams at the end of the 1966–67 season with Seattle and San Diego picking, in each round, after the NBA championship team, with Seattle continuing to have priority over San Diego.

On February 3, 1967, Klein and Schulman, acting on behalf of the partnership, petitioner's predecessor in interest, signed a note payable to Peoples National Bank of Washington (Peoples) in the amount of $1 million. Klein and Schulman personally guaranteed this loan and Peoples made two $500,000 payments

[15]Moreover, of these 50 players Seattle knew that some would retire. However, some nonprotected players had advised their owners that they would retire but prior to the draft no notification had been made to the NBA, the expansion clubs, or the press.

to the partnership on February 8 and May 1, 1967. These funds were used to pay part of the $1,750,000 total purchase price for the Seattle NBA membership.

In connection with this loan, projected financial statements for the Seattle franchise for a period of 6 years ending with the 1972–73 season were prepared. This financial forecast projected revenue from the following sources: (1) Home game gate receipts; (2) radio and TV; (3) preseason income; (4) programs and miscellaneous; (5) estimated refund of league dues; (6) sale of player contracts; and (7) estimated league expansion income. The assumptions underlying the projected financial statements provided with respect to radio and TV income that these amounts "have been projected using as a base the most recent national television contract which provides for $100,000 per member annually."[16] Also the assumptions to the projection state that estimated league expansion income was calculated under the premise that the NBA has indicated expansion to 20 teams over the next 5 years at the rate of 2 new members per year. Seattle would receive, approximately, $167,000 from each new member to be paid 50 percent upon entry into the NBA, the remainder payable equally over the succeeding 4 years.

With respect to the TV income, for 8 years prior to the 1962–63 basketball season, the National Broadcasting Co. (NBC) had carried NBA games on national television. NBC ceased carrying NBA games beginning with the 1962–63 basketball season.

For the 1962–63 and 1963–64 basketball seasons, the NBA had no national television contract with the national broadcasting companies (NBC, ABC, CBS). For the 1962–63 season, the NBA had an arrangement with a freelance network to carry the all-star game from Los Angeles and the final game of the NBA playoffs, netting the NBA $7,490.94 and $7,936.56, respectively. For the 1963–64 season, neither the NBA nor its member franchises received any revenue from national television.

In April 1964, the American Broadcasting Co. (ABC) and the

---

[16]Total gross income (including national and local) for radio and TV was shown as follows:

| | |
|---|---|
| 1967–68 | $150,000 |
| 1968–69 | 150,000 |
| 1969–70 | 200,000 |
| 1970–71 | 200,000 |
| 1971–72 | 300,000 |
| 1972–73 | 300,000 |
| Total | 1,300,000 |

NBA entered into a contract to televise NBA games on national television. Pursuant to this contract, ABC agreed to pay the NBA $600,000 for the exclusive right to telecast 16 regular Sunday afternoons, beginning January 3, 1965, and ending April 18, 1965. In addition, the contract provided that ABC had an option to televise any and all postseason playoff games for $37,500 per game. The contract further provided that (1) each of the individual NBA franchises retained the right to have its games telecast locally and in the franchise's adjacent market area (150 miles from the team city) at any time other than on Saturday afternoon or Sunday;[17] (2) ABC had an option to renew the contract for the 1965–66 season on the same terms, including price; and (3) ABC had the right of first refusal of a national television contract for the 1966–67 season.

Under an agreement dated March 7, 1966, as of October 19, 1965, which superseded any and all prior agreements between the parties, the NBA granted ABC the sole and exclusive worldwide television broadcast rights to NBA games played on 16 consecutive Sunday afternoons commencing January 2, 1966, and ending April 17, 1966, and commencing January 1, 1967, and ending April 16, 1967. These 16 games included postseason playoff games and the contract price for the 1966 games was $700,000 and $900,000 for the 1967 games. The contract also provided that ABC had an option to televise additional postseason playoff games for the price of one-sixteenth of the total year's fee per game. It also provided that each individual NBA franchise retained the unrestricted right to have its games televised locally in its team's city and the adjacent market area at any time other than Saturday or Sunday afternoon. Additionally, ABC had an option to telecast NBA games on the same terms for the 1967–68, 1968–69 and 1969–70 seasons, except that the price would be $1 million for 1967–68, $1.1 million for 1968–69, and $1.2 million for 1969–70. These options could be exercised no later than February 28 of each year, and each option was contingent upon ABC's exercise of the prior year's option. ABC also had a right of first refusal for the 1970–71 season.

On or about February 28, 1967, 1968, and 1969, ABC exercised

---

[17] If a playoff game was not televised nationally the home team could televise the game in its territory (75-mile radius) and the visiting team could televise the game in its home city plus two other locations in its territory.

its option to renew the national television contract with the NBA on the terms set forth in the agreement of March 7, 1966.

On February 6, 1970, ABC entered into a contract with the NBA for the exclusive worldwide network television rights to broadcast NBA games during each of the 1970–71, 1971–72, and 1972–73 basketball seasons. This contract provided that for the 1970–71 season, ABC had the right to broadcast 25 NBA games, to be selected by ABC and to include 17 regular season games, the all-star game, and 7 playoff games for $5 million, with the option to broadcast 3 additional regular season games and any number of additional playoff games for $140,000 per game. For the years 1971–72, the contract provided for a payment of $5,400,000 for the 25 regular season games and 7 playoff games, $150,000 for each additional regular season game, and $140,000 for additional playoff games. For 1972–73, the payments were $5,800,000 for the 25 regular games and 7 playoff games, $160,000 for each additional regular season game, and $140,000 for additional playoff games. The contract further provided that ABC had an option for 1971–72 and 1972–73 to extend coverage to 40 regular season games including Monday night games for a price of $6,600,000 for 1971–72 and $7 million for 1972–73. Additionally, the contract provided that ABC had the right of first refusal for the 1973–74 season.[18]

On September 1, 1967, petitioner contracted with Atlantic Richfield Co. (Atlantic) wherein Atlantic was granted the exclusive advertising sponsorship and radio and local television broadcast rights for the Sonics' games for a 5-year period for the total sum of $1 million.[19]

Revenues received by petitioner from its share of national television contract fees and fees from the Atlantic contract for each of its fiscal years ended May 31, 1968 through 1972, were as follows:

---

[18]The NBA has never entered into a national radio broadcasting agreement.

[19]The record indicates that Schulman and/or Klein had represented to Peoples National Bank, on Jan. 12, 1967, that they estimated local television and advertising revenue of $200,000 per year.

| FYE May 31— | ABC contract | Atlantic contract | Total |
|---|---|---|---|
| 1968 | $90,583 | $150,000 | $240,583 |
| 1969 | 105,010 | 175,000 | 280,010 |
| 1970 | 112,500 | 200,000 | 312,500 |
| 1971 | 318,824 | 225,000 | 543,824 |
| 1972 | 349,100 | 250,000 | 599,100 |
| Total | 976,017 | 1,000,000 | 1,976,017 |

Seattle played 29 of its 1967–68 season home games in the Seattle Coliseum which then had a seating capacity of approximately 12,595.[20] The Sonics also played some home games in the Seattle Arena which had a seating capacity of about 4,700 people. For the seasons 1967–68 through 1970–71 Seattle's won-lost record was as follows:

| Season | Total regular season games | Won | Lost |
|---|---|---|---|
| 1967–68 | 82 | 23 | 59 |
| 1968–69 | 82 | 30 | 52 |
| 1969–70 | 82 | 36 | 46 |
| 1970–71 | 82 | 38 | 44 |

Although NBA expansion teams have generally done poorly in an artistic and competitive sense during the first few years of the franchises' existence, they, Seattle being one, have frequently done rather well in terms of gate receipts.

The NBA total attendance and total gate receipts (exclusive of preseason exhibitions) for the years 1962–63 through 1967–68 was as follows:

| Year | Attendance | Gross gate receipts |
|---|---|---|
| 1962–63 | 1,937,745 | $3,943,703.86 |
| 1963–64 | 2,047,664 | 3,957,874.30 |
| 1964–65 | 2,069,419 | 5,220,608.99 |

[20] A lease agreement pertaining to the use of the Seattle Coliseum was formally executed on Sept. 7, 1967, by petitioner and the City of Seattle providing that 10 percent of the gross gate receipts (subject to a minimum rental of $1,000 and a maximum of $2,750 per game) would be paid by the Sonics to the lessor. The lessor retained all food and other concession rights. Prior to petitioner's grant of a franchise, informal arrangements had been made by the representatives of petitioner and the City of Seattle for use of the Coliseum.

| | | |
|---|---|---|
| 1965–66 | 2,319,637 | 6,442,831.52 |
| 1966–67 | 2,768,181 | 7,898,842.29 |
| 1967–68 | 3,349,511 | 10,508,184.29 |

As previously noted at footnote 3 herein, on May 28, 1967, the Seattle Professional Basketball team, a partnership, assigned its rights and obligations under the January 24, 1967, expansion agreement and all its assets and liabilities to Seattle SuperSonics Corp., a Delaware corporation. During the period between March 28, 1967, and March 28, 1968, the individual members of the then-defunct partnership paid a total of $7,900 to said corporation in exchange for 79 shares of $100 par value common capital stock which was distributed as follows:

| | |
|---|---|
| Eugene Klein | 33.5 shares |
| Samuel Schulman | 33.5 shares |
| Irving Levin | 10 shares |
| Harold Lipton | 2 shares |

Additionally, during this same period five other individuals contributed $202,100 in exchange for stock in the Delaware corporation. On October 7, 1967, a newly formed Washington corporation, Seattle Basketball Corp., issued 410,000 shares of its 20-cent par value common capital stock for all the assets and liabilities of the Seattle SuperSonics Corp., the Delaware corporation. The 410,000 shares of the Washington corporation were distributed in liquidation to the then shareholders of the Delaware corporation and the Delaware corporation was then dissolved. The shares were distributed as follows:

| Shareholder | Cash paid | Number of shares received |
|---|---|---|
| Klein | $3,350 | 137,350 |
| Schulman | 3,350 | 137,350 |
| Levin | 1,000 | 41,000 |
| Lipton | 200 | 8,200 |
| Five other shareholders | 202,100 | 86,100 |
| Total | 210,000 | 410,000 |

On May 1, 1968, 20,500 shares of common stock were sold to Richard Vertleib for $50,000, all of the then shareholders selling a proportionate number of their stock holdings. On March 13, 1969, 240,000 shares of stock in the Seattle SuperSonics Corp.

were offered to the public at the price of $7 per share. Of the 240,000 shares offered for sale, 144,000 were newly issued and 96,000 shares were owned by the above-described shareholders. All of the shares offered were sold for $7 per share of which sum the corporation received $6.44 per share.

As previously stated, the NBA took under active consideration an expansion program in 1966. The major factors then existing which made possible the consideration of enlargement of the league were as follows: (1) There had been a growing tendency, during the previous 2 or 3 years, for many cities which did not have an NBA team to authorize bonds to construct new municipal arenas suitable for the exhibition of professional basketball, (2) there was a sufficient number of talented basketball players coming out of college to stock the teams as the expansion movement progressed without significant dilution of talented players on the then-existing teams, (3) a national television program of NBA games would make it possible for millions of people throughout the country to become aware of professional basketball and therefore create readymade audiences for the NBA and its expansion teams, and (4) some NBA teams needed the cash proceeds of expansion from franchises.

Since 1965, and excluding the recent merger of the ABA and the NBA, nine expansion franchises have been granted by the NBA as follows: [21]

| Year | City | Price | Contract allocation to NBA membership | Contract allocation to first college draft and/or special expansion draft[22] |
|------|------|-------|------------------------|-------------------------------|
| 1966 | Chicago | $1,250,000 | $50,000 | $1,200,000 |
| 1967 | Seattle | 1,750,000 | 150,000 | 1,600,000 |
| | San Diego | 1,750,000 | 150,000 | 1,600,000 |
| 1968 | Phoenix | 2,000,000 | 180,000 | 1,820,000 |
| | Milwaukee | 2,000,000 | 180,000 | 1,820,000 |
| 1970 | Portland | 3,700,000 | 350,000 | 3,350,000 |
| | Cleveland | 3,700,000 | 350,000 | 3,350,000 |
| | Buffalo | 3,700,000 | 350,000 | 3,350,000 |
| 1974 | New Orleans | 6,150,000 | 615,000 | 5,535,000 |

The 1968 expansion was announced by the NBA following a

[21]Each expansion franchise executed a written agreement with the then-existing NBA franchises reflecting the terms and conditions of the grant.

[22]Includes interest at a rate of 4 percent per annum for franchises granted in 1968 and subsequent thereto.

meeting of its board of governors on January 21 and 22, 1968. The expansion was formalized by agreement with Phoenix and Milwaukee dated March 18, 1968.

As was the case with the Seattle and San Diego expansion agreements, the 1966 Chicago franchise agreement allocated the total consideration paid by the grantees between two assets: (1) The NBA franchise and (2) the right to participate in the special expansion draft and the May college draft held before the grantees' initial season of play.

In the written expansion agreements subsequent to that of Seattle and San Diego, none of the total consideration paid by a particular grantee was specifically allocated to the right to participate in the May college draft held before that team's first season of play, but the right to participate in the college draft, including an order of selection for such team,[23] was specifically conveyed to the expansion franchise in a separate paragraph of the agreement.

With the exception of the 1974 New Orleans expansion franchise, none of the other above expansion franchises were excluded from participation in, and sharing of, payments made with respect to the granting of a new franchise.[24] The New Orleans' expansion agreement specifically excluded New Orleans from sharing in the proceeds from the grant of the first two new franchises, if any, for the 1975–76 season and, moreover, none of the New Orleans' players were subject to selection by these two new teams in the expansion draft.

Special expansion drafts were conducted in connection with franchises granted in 1968 through 1974. Two of petitioner's players were selected by Milwaukee and one by Phoenix in the 1968 special expansion draft; again two of petitioner's players were selected in the 1970 special expansion draft, this time by Portland; and in the 1974 expansion draft New Orleans selected one of petitioner's players.

Under the terms of the 1968 and 1970 expansion agreements, petitioner's share of the proceeds of expansion including interest at 4 percent was as follows:

---

[23]A specific expansion team's order of selection in this college draft differed from that of another expansion team's order of selection in a prior or subsequent expansion year.

[24]Moreover, the New Orleans expansion agreement was the only one to refer to this possible event. Also, from 1965 to 1975, with the exception of New Orleans, the proceeds paid by the recipient of each expansion franchise were shared equally by the then-existing NBA teams. However not all of the existing teams lost an equal number of players in the special expansion drafts.

| | Two 1968 expansion teams | Three 1970 expansion teams | Total |
|---|---|---|---|
| 1968 | $166,666.68 | --- | $166,666.68 |
| 1969 | 41,666.68 | --- | 41,666.68 |
| 1970 | 41,666.66 | $321,428.58 | 363,095.24 |
| 1971 | 41,666.66 | 117,857.16 | 159,523.82 |
| 1972 | 41,666.66 | 117,857.16 | 159,523.82 |
| 1973 | | 117,857.13 | 117,857.13 |
| 1974 | | 117,857.13 | 117,857.13 |
| Total | 333,333.34 | 792,857.16 | 1,126,190.50 |

Petitioner's share of expansion proceeds attributable to the 1974 New Orleans franchise was $361,764.71 of which $97,516.13 was to be paid in 1974 and $264,248.58 during the years 1975 through 1979.

From 1965 to 1975, several NBA franchises were sold and the contract allocations of the respective sales/purchase prices were as shown in table I on page 835.

In January of 1967, the NBA was the only major league professional basketball league in the nation with the top 120 basketball players in the world playing in it with perhaps an exception or two.[25] Before the Sonics joined the NBA petitioner, as well as the other NBA teams, knew that the American Basketball Association (ABA) was being formed. The ABA announced its formation as an competitor with the NBA in February 1967 and played its first season in 1967–68. Although petitioner could not, in 1967, predict what success, if any, the ABA would have, it was common knowledge that price wars and substantial litigation costs had occurred in the then-recent professional football war between the National Football League and the American Football League.

Generally, the ABA proved to be a successful competitor of the NBA. ABA teams were able to sign numerous top college basketball players who were also sought after by NBA teams and, with each added year of play, became stronger and more competitive. In August 1969, representatives of the ABA and NBA commenced negotiations with respect to an agreement between the two leagues which would permit certain ABA

[25]However, the oldest and probably most financially successful professional basketball team in the world was the Harlem Globetrotters.

TABLE I

| Date | Team | Total price | (1) NBA franchise | (2) Player contract rights | (3) Area lease | (4) National TV rights | (5) Radio rights | (6) Furniture and fixtures | (7) Athletic equipment | (8) Team name | (9) Contract receivables | (10) Stock in NBA Properties, Inc. | (11) All other assets |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1965 | Los Angeles Lakers | $5,175,000 | $250,000 | $4,025,000 | $280,000 | $350,000 | $100,000 | $19,999 | | $1 | $150,000 | | $10,000 |
| 1965 | Boston Celtics | 12,925,000 | 200,000 | 2,715,000 | | | | | | Included in (1) | | | |
| 1968 | St. Louis Hawks | 3,200,000 | 50,000 | 2,990,000 | | 150,000 | | | $5,000 | Included in (1) | | $2,500 | 2,500 |
| 1968 | Boston Celtics | 3,600,000 | 360,000 | 3,200,000 | | | | | | Included in (1) | | | 40,000 |
| 1971 | San Diego Rockets | 5,000,000 | 400,000 | 4,500,000 | | 90,000 | | | 500 | Included in (1) | | 8,000 | 1,500 |
| 1972 | Boston Celtics | 4,550,000 | Agreement did not allocate purchase price to assets transferred. | | | | | | | | | | |
| 1973 | Kansas City—Omaha Kings | 3,000,000 | Agreement did not allocate purchase price to assets transferred. | | | | | | | | | | |
| 1974 | Detroit Pistons | 7,000,000 | 1,750,000 | 5,225,000 | | | | | | | | | 25,000 |
| 1975 | Atlanta Hawks | 5,998,889 | 350,000 | 4,630,000 | | 500,000 | | | | | | | 518,839 |

[1] Excluding cash on hand, U.S. Treasury bills, and accounts and notes receivable of the corporation.

[2] All other assets were those pertaining to the operation of a professional basketball team including, without limitation thereon, all rights to player reserve lists, draft rights, trade rights, all contract rights with its coach, and all rights to contracts for upcoming exhibition games. The following assets were not transferred and remained property of the seller: (1) All money due and payable by the NBA at the close of its year ending May 31, 1968, with respect to the seller's capital account in the NBA; (2) all expansion proceeds due and hereafter to be made to the seller, in the absence of this sales agreement, on account of the admittance in the NBA of the Seattle, San Diego, Milwaukee, Phoenix, and Chicago expansion franchises; (3) all office equipment, and furniture, furnishings, and fixtures used in office of the seller; and (4) all other assets not directly related or pertaining to seller's business of operating a professional basketball team.

After the sale, the team moved to Atlanta, Ga.

[3] All other assets included all seller's interests in television and radio rights, its lease with the Boston Garden Arena Corp, stock interest in N.B.A. Properties, Inc, equipment, etc. This agreement specifically excluded from the sale the following assets: (1) All payments of expansion proceeds to be made to seller under the expansion agreements admitting to the NBA Seattle, San Diego, Milwaukee, Phoenix, and Chicago basketball franchises; (2) all cash on hand and any tax refund seller is, or may become, entitled; and (3) any payments due to seller attributable to the 1967–68, and prior, basketball seasons.

[4] All other assets include goodwill, draft rights, etc. National TV rights sold were for the 1971–72 basketball season. Assets specifically excluded from the sale included: (1) All moneys due and payable to seller by NBA prior to the date of this agreement; (2) all expansion proceeds payable or to be paid to seller by the Milwaukee, Phoenix, Portland, Cleveland, and Buffalo franchises; and (3) all office furniture and fixtures of the seller, and all cash and accounts receivable as of date of this agreement. After the sale, the franchise relocated in Houston, Tex.

[5] Assets were sold for $3,700,000 in cash and the buyer's assumption of obligations and liabilities in the amount of $855,000.

[6] $5,225,000 was allocated to player and coach contracts. Other assets were stated to be $25,000 for tangible property. The agreement specifically excluded from the sale any expansion money due the seller attributable to the admittance of the New Orleans franchise.

[7] More completely, the contract allocations were: (1) NBA franchise and all related rights from NBA, $850,000; (2) taxable personal property, $518,839; (3) rights to income for the 1975–76 NBA season from national television contract, $500,000; and (4) player contracts, draft rights, etc, $4,630,000.

teams to be admitted into the NBA. On March 16, 1970, the NBA board of governors approved an arrangement whereby the two leagues would enter into an agreement to admit a number of ABA teams into the NBA as follows: (1) No fewer than 8 nor more than 11 ABA teams would be admitted as members of the NBA; (2) each admitted team would pay to the NBA $1,250,000 with $125,000 down and the balance in 10 equal annual installments; (3) ABA teams admitted into the NBA would not share in the NBA national television revenues for a period of 3 years; (4) the ABA antitrust suit against the NBA would be dismissed; (5) the Washington and Los Angeles ABA teams would move out of NBA territory before becoming members of the NBA; and (6) Rick Barry would leave his ABA team and "go back to the San Francisco NBA team but any other player who had been under contract to an NBA team and had entered into a contract with an ABA team would be subject to negotiation and settlement between the NBA and ABA team concerned except that any former NBA player now on an ABA team which does not enter in the NBA would return to the NBA team from which he came; all other players on any ABA team which does not enter the NBA would be distributed among the ABA teams which do enter the NBA [sic]."[26]

On May 7, 1971, a final agreement was entered into between the ABA and NBA. The agreement incorporated essentially the same terms set forth above with the clarification that the ABA was to dismiss its antitrust lawsuit against the NBA and its member teams with prejudice. However this agreement was contingent upon the securing of enabling legislation in the form of an exemption from the antitrust laws. Although Senate hearings were held on this proposed legislation, the Senate bill was not reported out of committee.

Subsequent to May 31, 1976, an arrangement was entered into between the NBA and ABA whereby four ABA teams were granted NBA franchises. Petitioner's share of the proceeds payable to the NBA in connection with these grants is approximately $700,000.

At the November 21, 1966, NBA board of governors' meeting it was agreed that the existing NBA disaster plan should be

---

[26]The NBA and ABA also agreed to participate in a common college draft prior to the ABA's first season in the NBA.

revised. The revised plan provided that, in case of a major disaster (the players of an affected team are permanently incapacitated and unable to play basketball by virtue of death, dismemberment, or physical inability), the member club involved will select one player from each NBA team's active player roster at a price of $50,000 per player. Prior to the selection each team may protect five of its players.

For the period September 1, 1967, through September 1, 1968, petitioner obtained and named itself the beneficiary of accident indemnity insurance on its players, coach, and managers, subject to an overall limitation of $2.5 million. The cost of the policy was $4,200. Four of its players were each insured for $300,000, seven players were each insured for $100,000, and four players were each insured for $50,000. Subsequently, three of the four players insured for $50,000 were deleted from the policy and a $262.50 refund of premium was obtained, and the fourth player's insurance coverage was increased from $50,000 to $100,000 for an additional premium of $87.50. Also for an additional premium of $350, insurance on four of the $100,000 ball players was increased to $150,000 each. Petitioner's coach and two managers were each insured for $100,000.

Of the 15 veteran players selected by petitioner in the 1967 special expansion draft, 9 made the Sonics' 1967–68 active roster, 1 was placed on waivers and acquired by another NBA team for the $1,000 waiver price,[27] and 5 retired and did not play for Seattle. The Sonics retained the exclusive NBA playing rights for these five players, and in 1968 the Atlanta Hawks purchased the playing rights of one of these players for both the assumption of the player's pension plan liability and the right to another player who did not, before or after the trade, play in the NBA. Also one player, of these five, signed a contract to play in the ABA. The 15 players acquired by petitioner in the expansion draft had a total of 48 years of prior experience in the NBA, and the 9 players who made the club had a total of 26 years of NBA

---

[27] In a waiver transaction, the selling team notifies the league office that the player is being placed on waivers; all other NBA teams thereafter have a fixed period of time to notify the league office that they wish to acquire the contract of the waived player for the price of $1,000. If no team notifies the league that it wishes to acquire the right to such player, he becomes a free agent. The fact that a player is placed on waivers indicates that he, in the judgment of management, would have been at best the 13th player on that team's roster. Placing a player on waivers normally means that the team owning the rights to his services cannot sell those rights within the NBA for more than $1,000.

playing experience. Additionally three rookies chosen in the 1967 college draft made the Sonics 1967–68 active roster.

Four of the 15 players chosen in the 1967 special expansion draft remained on the Sonics' active roster at the beginning of the 1968–69 season. Of the nine players on the Sonics roster in 1967–68, three players were selected in the 1968 expansion draft pool by either Milwaukee or Phoenix, one player retired and the other was traded to the St. Louis Hawks for another player. Of the three rookies who made the 1967–68 team, one was traded for another player on February 1, 1969, to Cincinnati, and another was waived in February of 1969.

At the beginning of the 1969–70 season only 3 of 15 expansion draft players remained on the Sonics' active roster. Prior to the start of the season one player had been waived and then sold to an ABA team for $4,000. The one remaining 1967 college draft choice on the Sonics' roster from their prior two seasons continued to play for the team during the 1969–70 season. Also the player acquired in 1969 from Cincinnati in exchange for one of the Sonics' 1967 college draft players was sold in January 1970 to Los Angeles for $55,000.

After the 1970–71 NBA season, none of the 15 expansion draft veterans remained on the Sonics' roster. Two of the three veterans retired after the 1970–71 season and the third was selected by Portland in the 1970 expansion draft. However the player received in the 1968 trade from the St. Louis Hawks continued as a member of the Sonics through the 1971–72 season.

The schedule on page 839 (Table II) summarizes and compares the total minutes played by the different categories of players that played for the Sonics during the 1967–68 through 1970–71 seasons.

Generally, there is a direct relationship existing between the salary of an NBA player and the market value of his player contract. A relatively higher salaried player is indicative of a relatively higher market value of the player's contract. However, if two players are in fact truly comparable in all respects, then the rights to the player with the lower salary would have the higher market value. Other factors would also be relevant such as age and temperament. For the 1967–68 season, total compensation paid to the Sonics' players (including amounts paid to sign contracts or as bonuses) was $221,000 with the

TABLE II

| | 1967-68 Season | | 1968-69 Season | | 1969-70 Season | | 1970-71 Season | |
|---|---|---|---|---|---|---|---|---|
| | Minutes played | Percent of total | Minutes played | Percent of total | Minutes played | Percent of total | Minutes played | Percent of total |
| Special expansion players[1] | 14,485 | 73.3% | 8,292 | 41.8% | 6,280 | 31.8% | 5,230 | 26.5% |
| 1967 College draft players[2] | 5,270 | 26.7% | 5,324 | 26.9% | 4,237 | 21.4% | 142 | .7% |
| Subtotal: Original players | 19,755 | 100.0% | 13,616 | 68.7% | 10,517 | 53.2% | 5,372 | 27.2% |
| Post-1967 college draftees[3] | --- | --- | 5,731 | 28.9% | 9,194 | 46.5% | 10,212 | 51.8% |
| Others | --- | --- | 483 | 2.4% | 69 | .3% | 4,146 | 21.0% |
| Total | 19,755 | 100.0% | 19,830 | 100.0% | 19,780 | 100.0% | 19,730 | 100.0% |

[1]Includes players acquired for expansion players.
[2]Includes players acquired for 1967 college draftees.
[3]Includes players acquired for post-1967 college draftees.

highest salaried player receiving $35,000 and the lowest salaried player receiving $11,000.

For its fiscal years ended May 31, 1967 through 1970, the NBA filed U.S. partnership income tax returns. By joint venture agreement dated June 1, 1966, the then NBA members memorialized, in writing, that the members have been, are, and desire to continue their relationship as joint venturers. Article IV of this agreement provided that the net income, if any, and net losses of the joint venture shall be credited and charged as follows:

4.1 For accounting purposes, an individual income account shall be maintained for each Joint Venturer. Any net income or losses shall be credited or debited to the individual income account as soon as practicable after the close of each fiscal year.

4.2 The net income, if any, of the Joint Venture shall be credited equally to the income account of each of the Joint Venturers.

4.3 The net losses of the Joint Venture shall be chargeable in the same proportion as the capital contribution made on the basis of gross gate receipts, up to the amount of such contributions. Thereafter any net losses of the Joint Venture shall be chargeable equally to each of Joint Venturers.

4.4 If there be no credit balance in the individual income accounts, net losses shall be debited to the individual capital accounts. If the capital account of a Joint Venturer shall have been depleted by the debiting of losses under this paragraph, such capital account shall be restored in accordance with the provisions of the constitution.[28]

The NBA's accountant in certifying the league's report on summary of cash receipts and disbursements for each of its years ended May 31, 1967 through 1972, provided, in footnote A accompanying the financial statements, that "the income tax status of the Association for current and prior years has not been finally determined." The note accompanying the financial statements for the NBA's year ended May 31, 1973, similarly provided the identical statement and added:

On May 23, 1973 a ruling was received from the Internal Revenue Service that if the operations of the Association are transferred to a corporation, that corporation could operate in the future as a tax exempt corporation.

For financial statement and tax purposes, petitioner initially treated $1,600,000 of the $1,750,000 paid, pursuant to the January 24, 1967, expansion agreement, as attributable to player

---

[28]On its income tax returns for its years ended May 31, petitioner deducted as an "other deduction" (line 26, Form 1120) its allocable share as determined under article IV of the association's expenses incurred for the corresponding NBA's year ended May 31.

contracts and subject to amortization over a 5-year period. The Sonics did not allocate the $1,600,000 among individual player contracts. This amount was reduced, in part, by the amount of the expansion proceeds received from the Phoenix and Milwaukee franchise grants. In 1970 petitioner allocated, for tax and financial purposes, $1,599,000 among the nine veterans who were selected in the 1967 expansion draft and made the team.[29] No allocation of cost was made to the three rookies acquired in the 1967 college draft. Petitioner's cost basis for each of the nine veteran players was determined by computing the ratio between an individual's 1967–68 salary and the total salaries paid to the nine players and then multiplying that ratio by the $1,599,000 purported to be paid for the expansion player contracts. Also, the 1970 retroactive change reduced to zero the cost basis accounts (after amortization) of the players who were selected in the 1968 expansion draft.

Respondent, in his notice of deficiency dated October 17, 1973, determined, in pertinent part, the following:

The amount allocable to the right to participate in a special Expansion Draft and in the Annual College Draft for 1967 did not exceed $450,000.00. The balance of the price [$1,750,000 less $450,000] represents the amount paid for the rights and privileges of a franchise holder or other intangible rights having an indeterminate useful life. Therefore, the basis for amortization of player contracts is $450,000.00 instead of $1,599,000.00 as shown on your return.

Moreover, respondent determined:

(1) The $450,000 was allocated among the 12 players on the 1967–68 active roster based upon a ratio of salary paid to a player over total salary paid to the 12 players, and a 5-year useful life was allowed.

(2) Proceeds received from a subsequent grant of a new expansion franchise were treated as follows: (a) Total proceeds to be received less interest income included (or to be imputed) thereon was calculated. (b) The adjusted basis of the players selected from the Sonics' roster was determined and the total adjusted basis was subtracted from (a), the remainder being gain. (c) The gain was then divided into: (i) section 1245 gain and (ii) capital gain.

---

[29]The difference between the $1,600,000 and $1,599,000 is attributable to the $1,000 waiver price received for 1 of the 15 veterans sold to another NBA team.

(3) Similarly, petitioner's sales of its player contracts were treated under the method outlined in (2) above.

By amended answer, filed June 22, 1976, respondent alleged in support of his claim for an increased deficiency that:

None of the total amount paid by petitioner, $1,750,000, in connection with the agreement of January 24, 1974 [sic] is properly allocable to intangible property or rights which qualify for an annual deduction for depreciation or amortization. * * * Although in said agreement, the parties purported to allocate $150,000 to the "franchise" and $1,600,000 to the right to acquire basketball players in the special expansion draft and the 1967 college draft, this purported allocation was totally devoid of economic substance. In fact, petitioner agreed to purchase, and the NBA and its member teams agreed to sell, a mass of indivisible intangible assets for a lump sum price * * * [which] is not susceptible to allocation among the individual right and privileges acquired, nor among categories of rights and privileges acquired.

* * * The rights and privileges acquired by petitioner * * * had an indeterminate useful life.

Accordingly, petitioner had no allocable basis for any of its players acquired in the special expansion draft.[30] Furthermore, respondent alleged that:

The amounts paid petitioner as its share of * * * expansion proceeds [from subsequent grants of NBA franchises] did not constitute proceeds from the sale of specific players who were made available for the expansion drafts by Seattle, and who were actually drafted * * * . Accordingly, the amounts received by petitioner constitute capital gain to the extent of the full amount paid to petitioner * * *

Alternatively, respondent alleged that, in the event we decide a portion of the $1,750,000 is allocable to assets or rights which qualify for amortization, the amount qualifying for amortization does not exceed $450,000 as set forth in his notice of deficiency.

OPINION

The major issue herein, deficiency-wise, can be simply stated: What portion, if any, of the $1,750,000 petitioner paid for an expansion franchise in the NBA can be depreciated (amortized) under section 167(a) of the Internal Revenue Code?

We have detailed in our findings what bundle of rights were purchased by petitioner, and, judging from the parties' briefs, believe our findings on this score to be relatively noncontroversial. For convenience we restate the specified rights as follows:

---

[30]Except for the unamortized amount of any signing bonus, etc.

The right to participate in a special expansion draft of veteran basketball players; the right to participate in the 1967 and post–1967 NBA college drafts; the right to share in all revenue from national television broadcasting of NBA games; the exclusive local broadcasting rights to Sonics' games; the right to share in revenues derived from the NBA all-star and playoff games, and promotional and merchandising activities; the right to share in the NBA's goodwill as well as the opportunity to develop a reputation and goodwill in the Pacific Northwest; the right to share in the proceeds of future NBA expansion; protection from intraleague competition for a team's rights to its players and draft choices; the right to participate in the exhibition of NBA professional basketball by competing with other teams in the league as well as other rights and benefits of being a member of the NBA;[31] and finally, the exclusive territorial rights for NBA basketball within a 75-mile radius of Seattle.

The $1,750,000 purchase price was allocated, under the January 24, 1967, agreement, to (1) petitioner's rights to participate in the special expansion draft and the 1967 NBA college draft—$1,600,000, and (2) the rights and privileges of an NBA franchise holder—$150,000. It is hornbook law that we are not bound by said allocation and are free to deviate therefrom in accordance with the facts of the case. *Buddy Schoellkopf Products, Inc. v. Commissioner*, 65 T.C. 640, 647 (1975).

The forenoted section 167(a) permits a deduction for a reasonable allowance for exhaustion, wear and tear, and obsolescence of property used in a taxpayer's trade or business or held for the production of income. The property must be an intrinsically wasting asset, *Griswold v. Commissioner*, 400 F.2d 427, 433 (5th Cir. 1968); however, its useful life is not necessarily the useful life inherent in the asset but it is the period over which the asset may reasonably be expected to be useful in the taxpayer's trade or business. Sec. 1.167(b)–1, Income Tax Regs. The term property includes intangibles, and depreciation guidelines pertaining thereto are set forth in section 1.167(a)–3, Income Tax Regs., as follows:

If an intangible asset is known from experience or other factors to be of use

---

[31] It is true, as petitioner argues, that it assumed certain obligations by accepting a franchise. We do not find that these obligations were a detriment but rather believe that they enhanced and protected the value of the rights received.

in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. Examples are patents and copyrights. An intangible asset, the useful life of which is not limited, is not subject to the allowance for depreciation. No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. *No deduction for depreciation is allowable with respect to goodwill.* [Emphasis supplied.]

The amount of the depreciation deduction is determined by reference to the taxpayer's basis in the property. Sec. 1012. Contract rights, as well as the other intangibles acquired by petitioner, may be subject to an allowance for depreciation. See 4 J. Mertens, Law of Federal Income Taxation, sec. 23.64, p. 228 (1973 rev.).

Therefore we take as our governing principles that intangible property qualifies for an amortization deduction if it (1) has a limited useful life, the duration of which can be ascertained with reasonable accuracy, and (2) has an ascertainable value (cost basis) separate and distinct from goodwill and going-concern value.[32] *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1250 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); *Ralph W. Fullerton Co. v. United States,* 550 F.2d 548, 550 (9th Cir. 1977).

## 1. *Applicability of Mass Asset Theory*

Respondent, in an attempt to win it all, contends that the record clearly indicates that the mass asset, or indivisible asset, theory is applicable herein. As applied to the instant facts respondent contends that petitioner purchased a collection of inextricably intertwined, intangible assets or rights whose values are so interrelated and interdependent that they are not capable of separate valuation other than in an unacceptable arbitrary manner. Further, each particular right does not diminish with the passage of time. To put it another way, the value of the mass of acquired assets does not lie in its individual components but in the whole indivisible bundle. Therefore, the price petitioner paid was a lump sum for the collection of rights that make up a franchise and are independently valueless without the franchise.

---

[32]Going-concern value of a business, like goodwill, is not subject to an allowance for depreciation. *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 232 n. 7 (1975).

Respondent recognizes that a conclusion that petitioner acquired a single indivisible asset for a lump-sum price does not necessarily resolve the issue of whether it can qualify for amortization. Even an indivisible asset is subject to depreciation if it has a limited useful life which can be reasonably estimated. Compare *Sunset Fuel Co. v. United States*, 519 F.2d 781, 784 n. 4 (9th Cir. 1975); *Manhattan Co. of Virginia, Inc. v. Commissioner*, 50 T.C. 78, 91 (1968); *Commissioner v. Seaboard Finance Co.*, 367 F.2d 646, 653 (9th Cir. 1966), affg. a Memorandum Opinion of this Court, with *Boe v. Commissioner*, 35 T.C. 720, 726 (1961), affd. 307 F.2d 339 (9th Cir. 1962); *Thrifticheck Service Corp. v. Commissioner*, 33 T.C. 1038, 1047 (1960), affd. 287 F.2d 1 (2d Cir. 1961).

However, relying principally upon *Boe v. Commissioner, supra*,[33] respondent submits that there are several factors present that are indicative of a nonwasting mass and therefore of a nonamortizable character: (1) The mass includes intangibles of indefinite duration which provide the means to replace those individual intangibles that are likely to expire, thus regenerating the value of the mass as an entity;[34] (2) the intangibles of indefinite duration are relatively more significant in value than parts of the mass which may expire; and (3) the intangibles that do expire derive their value, and have no value separate and apart, from the assets of indefinite duration.

In *Boe v. Commissioner, supra*, petitioner was one of four partners who purchased a contract medical service organization, the assets consisting of 8,984 medical service contracts to provide medical services to subscribers for a fixed sum; furniture, fixtures, and fittings; accounts receivable; goodwill; and the seller's convenant not to compete. The purchase price of $272,389.08 was allocated, pursuant to the sales agreement, to (1) furniture and fixtures, etc.—$2,346.27, and (2) the balance of $270,042.81 to goodwill and other properties transferred. The taxpayer allocated a cost of $30.94 to each medical contract and attempted to deduct, as a loss, each contract as it was terminated.

---

[33]We note that any appeal in this case lies to the Ninth Circuit.

[34]Respondent asserts that the reputation of the NBA, together with the NBA player allocation system, virtually assured petitioner of a source to replenish its player roster; and given this regeneration capability, the indivisible asset as a whole has an indefinite useful life even though specific players continually ceased to play.

We found that the $270,042.81 was a lump-sum payment for the organization and business, and citing, at page 726, *Thrifticheck Service Corp. v. Commissioner, supra:*

that the acquisition of these contracts constituted the acquisition of but one intangible capital asset which is not exhausted by the passage of time alone, but has such a characteristic of continuing value and useful life that it cannot bear amortization.

The Ninth Circuit affirmed our decision and, in so doing, noted that the contract allocated $2,346.27 to physical assets and "'The balance thereof to the Goodwill and *other properties* hereby transferred of said practice.'" (Emphasis supplied.) The court then stated at page 343:

There were no "other properties" of any substantial value except the contracts, and they are, in our view, inseparable from the good will. They are terminable at will, and their value depends entirely upon the expectation * * * of continued patronage. We doubt if any value could properly be assigned to them, apart from good will. It is conceded that good will is not a depreciable asset. ( * * * Income Tax Regs., sec 1.167(a)–3, 1954 Code). [Fn. ref. omitted.]

Insofar as we are aware, the cases in which the mass asset theory has been utilized all involve a customer list, insurance expiration list, or a similar type of intangible asset with an indefinite life where such property was the principal purchased asset.[35] We further bear in mind that the Ninth Circuit has also held: "The rationale and purpose of the 'indivisible asset' rule is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased * * * [and make] it possible to strike down depreciation deductions for amounts which should properly be allocated to good will." *Commissioner v. Seaboard Finance Co., supra* at 652. We stated the same proposition in *Computing & Software, Inc. v. Commissioner,* 64 T.C. 223, 234 (1975), as follows:

The theory is designed to prevent * * * [allocation] to relatively insignificant depreciable assets [of] the price actually paid for nondepreciable intangibles. [Fn. ref. omitted.]

With the foregoing rationale for the mass asset theory, together with examples of its application, in mind, we hold that the concept is inapplicable to the facts herein. We so hold

---

[35]We note that respondent, on brief, recognizes that the intangibles herein are not readily comparable to customer lists, etc.

because of our belief that a significant portion of the rights purchased by petitioner can be separately identified as to life and value and are not inextricably intertwined with goodwill. Specifically, we cite the right to share in the proceeds from the 1968–69 expansion program and the right to participate in a special veteran expansion draft.

(a) *Life of 1968–69 expansion proceeds and expansion draft players.*—Of the two requirements, we look at the question of an estimative limited life first. Obviously, the life of any payments due under the 1968–69 expansion program was contemporaneous with the payment schedule set forth in the expansion program documents of March 18, 1968. We have no difficulty in finding a predictable life to this right.

The question of estimating the life for the expansion draft players presents more of a problem, but we reach the same favorable conclusion for petitioner. We believe that the expansion draft players can be separated out from the other assets, including the players selected in the college draft. At the outset we find that there is no meaningful distinction, for purposes of this discussion, between the right to negotiate with 15 players from the expansion pool and the precise players selected.[36]

The expansion draft players were important to the initial financial success of the franchise. Obviously the Sonics could not reasonably expect to field a competitive team in the early years from the college draft alone. They needed a nucleus of proven professional players with some degree of name recognition.[37]

---

[36]In this connection we note Klein's testimony concerning mock expansion drafts conducted prior to January 1967:

Q. Fine, sir. Did you have any opinion or educated guess as to what players you might expect to receive as a result of the expansion draft?
A. Yes, as we would negotiate a number, and if the freeze number was—we conducted a mock draft, and we would attempt to ascertain to our best educated guess from our best judgement—if the number were, say seven, who the seven members of each team would be that would be frozen, and who then would be available for us to choose from. If the number were nine, the same thing would apply. The freeze number was vital in our negotiations, and in our thinking, in the price—everything. So that we constantly negotiated the freeze number. Every time we came to a new number, we would get together and conduct a mock draft, and we would then have a reasonable guess as to who we would get and what players we would get.

[37]For example Klein stated:

"it was terribly terribly important who our players were going to be, and how much we were going to pay for the athletes, what the athletes were going to cost us. We felt very strongly that Seattle is a excellent sports town, that we would get excellent results. We were hopeful of getting excellent attendance results, but that, of course, is very proportionate to the kind of entertainment you provide the customers. Having been in the entertainment business for a long time, we were doubly aware of

The amount of revenue from ticket sales and local TV and radio contracts could be anticipated to be directly related to the success of the team on the court.

Since basketball is a five-man team sport, it could be foreseen that the college draft players would, within a relatively short period of time, supplant the expansion draft players. The record demonstrates that this is what, in fact, happened.[38]

However brief a time it might have been, the expansion draft players did make a unique, identifiable contribution to the franchise. The parties have agreed that, in the event we find the veteran player rights to have a limited useful life, then such life shall be 5 years.

(b) *Value of right to 1968–69 expansion proceeds and expansion draft rights.*—We further believe then that these two assets, expansion program proceeds and expansion draft rights, have a determinable value and hence meet the second prerequisite to amortization. Our discussion with respect to the values will serve the dual purpose of demonstrating why we believe this second prerequisite to have been met as well as setting forth the precise values themselves.

Also implicit in our discussion is that we agree with the respondent that the January 24, 1967, agreement, allocating $150,000 to the franchise and $1.6 million to the rights to participate in the expansion and college draft in 1967, is devoid of economic substance and defies the realities of the transaction. It is, in fact, ludicrous to suggest that over 90 percent of the purchase price was attributable to the right to select players in the year of purchase with their relatively short playing life, and less than 10 percent to the right of indefinite duration to an NBA franchise. The tax consequences of the transaction must reflect its meaningful substance and, necessarily, our determination of the true nature of the transaction. *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945).

---

how important it was to provide a ball club that was competitive, reasonably competitive. We wouldn't come in with a—wouldn't give them a bunch of stiffs. There is no way we—there is no better way to draw people. We had to be competitive. It's probably, the most important factor then was what kind of team we were going to be able to present to the public."

[38]The record shows that during the 1967–68 season, the Sonics' expansion veterans played 73.3 percent of total minutes of playing time while its college draftees accounted for remainder of total playing time. During the 1968–69 season, the college draftees played 55.8 percent of the total game time while the expansion veterans accounted for 41.8 percent. In its third season, the college draftees played 67.9 percent of total minutes of playing time as compared to the veterans playing 31.8 percent of the game time.

Turning first to the NBA expansion program, we are convinced that the documentary, as well as testimonial, evidence herein establishes that petitioner paid $250,000 for the right to participate in that program for 1968–69. While the December 20, 1966, NBA expansion committee's memo to the board of governors did not refer to any subsequent NBA expansion (aside from the 1967–68 season), the board's minutes of December 20, 1966, in adopting its committee's recommendations, added the following proviso:

(12) The two new cities added to the NBA beginning with the 1967–68 season will *not* participate in any way in the 1968–69 expansion. [Emphasis supplied.]

The approval of petitioner's franchise at a special meeting of the board on January 10, 1967, was in all respects identical to the board's minutes of December 20 except that the cost of the franchise was increased $250,000 and petitioner was granted the right to participate in any 1968–69 NBA expansion program. The quid pro quo seems obvious. While the January 24, 1967, expansion agreement did not specifically refer to petitioner's participation rights in any 1968–69 expansion or, for that matter, any subsequent NBA expansion, absent insertion of specific language in the franchise grant to the contrary, petitioner possessed such rights as a member of the NBA.

The foregoing documentary evidence is consistent with the testimony of Schulman and Commissioner Walter Kennedy. We heretofore noted that Klein represented the Sonics in preliminary negotiations with the NBA. However, when the deal was consummated on January 10, Schulman was directly involved. Schulman testified that he was convinced by Mr. Cooke (a member of the expansion committee) that it would be in Seattle's best interest to pay an additional $250,000 and be permitted to participate in the 1968–69 expansion. Also, Schulman felt that the Sonics should not be "cousins" with the other teams but a "full" franchise with participation in all NBA activities. Although Commissioner Kennedy was not privy to the entire Schulman/Cooke discussion, he was present at various times and testified that Cooke and Schulman were discussing an increase in the cost from $1.5 to $1.75 million. Moreover, the record shows that the expansion committee reported to its board of governors that it recommended an increase of $250,000 with the understanding that Seattle would participate in the next

expansion program. We find Schulman's testimony to be forthright and highly credible.

While perhaps not a typical situation, we find that the $250,000 was the negotiated price for the right to participate in the 1968–69 expansion program and should be offset, after reduction for any imputed interest thereon, against the 1968–69 expansion proceeds received by petitioner.[39]

We turn next to perhaps the most difficult factual question in the case, valuation of the expansion draft rights. Petitioner, on brief, has taken a two-prong approach in valuing the expansion player rights, to wit: (1) Valuation of the rights themselves without consideration of the specific players acquired and (2) in order to confirm the reasonableness of the valuation under the first method, valuation of the drafted veteran players individually.

Petitioner relies upon the expert testimony of three witnesses. Joseph Axelson, general manager of the Kansas City Kings of the NBA for 7 years, testified that the other NBA teams were giving up, theoretically, their 8th, 10th, and 11th best players which on the average would represent 7 percent, 2 percent, and 1 percent, respectively, of the total value of that club. Using an average value of $1.75 million for the 10 then-existing teams (the price paid by petitioner and San Diego), he concluded that the 10 existing clubs were giving up players in the expansion draft having a total value of approximately $1.75 million (10 percent of $1.75 million × 10 teams). As petitioner and San Diego divided the pool of players, petitioner's 1967 expansion draft rights should be valued at $875,000.

Marty Blake, general manager of the St. Louis (now Atlanta)

---

[39]We note further respondent's contention that petitioner, for financial statement and tax purposes, did not separate a specified amount of the purchase price attributable to the subsequent expansion. While certainly puzzling, we do not believe this omission requires us to deny separate allocation. Cf. *Reynolds Metals Co. v. Commissioner*, 68 T.C. 943, 958 n. 17 (1977), dismissed by agreement of the parties,    F.2d    (4th Cir. 1978).

Finally, respondent, in a "fall-back position," submits that if petitioner paid an additional $250,000 for anything, it was for full participating rights as an NBA franchise holder. NBA membership rights last indefinitely and gain or loss from the disposition thereof is recognized only when the rights have been sold in a completed transaction. By allowing a $250,000 offset to the 1968–69 expansion proceeds, this is the same as saying petitioner sold a portion of its franchise to the two newly admitted teams, which, in fact, petitioner did not do. We do not agree. We have concluded that petitioner negotiated and paid an additional $250,000 for the right to participate in the 1968–69 expansion program. There was no certainty that the NBA would expand in 1968. What petitioner acquired was a specific right which also made it a full partner in the NBA. The two can be separated. Clearly petitioner would not have acquired this right if its acquisition had not assured it full membership during the 1968–69 season.

Hawks from 1954 to 1971, testified that out of 50 players in the veteran pool there were "easily five or six players because of the nature of the draft that would be worth a considerable amount of money." Blake placed $300,000 on the right to select first in the draft, $200,000 on the second draft selection, and stated that the total value of the 30 veteran selection rights was $1.8 million, allocating $950,000 to the winner of the coin flip (San Diego) and $850,000 to the loser (Seattle). Finally, Don Richman, the Sonics' first general manager, testified that he anticipated the Sonics in their sixth year would be worth $4.5 million, with one-third of the value attributable to the 1967 expansion draft veterans, one-third of the value attributable to management, and one-third to the remainder (suballocated one-third to the 1967 college draft rights, one-third to post–1967 college draft rights, and one-third to all other NBA membership rights). Petitioner concedes on brief that the Sonics' management was not among the assets acquired in 1967 for a consideration of $1.75 million and, giving respondent "the benefit of the doubt," submits that Richman's testimony results in a valuation of $875,000 to expansion player rights ($1.75 million purchase price × ($1.5 million ÷ $3 million)).

Therefore, the average of the three experts' valuations for the veteran rights is approximately $883,000.[40] Moreover, petitioner relies upon the testimony of other witnesses actively engaged in NBA basketball to support its position that the bulk of the $1.75 million was attributable to the player rights. Additionally, petitioner submits that the 1966 NBA disaster plan, providing the affected team with the right to select one player from each of the other teams' rosters for $50,000 with each member able to protect five of its players, further exemplifies the substantial value attributable to NBA player rights. While petitioner admits this $50,000 payment was for the selection rights to the other members' sixth player, rather than, as in the instant case, its 8th player, petitioner contends that the philosophy of the plan was to assure the restocking of the affected team in lieu of giving full value for the selected players. Thus, if here $50,000 is used as the minimal value for the average player selected in the 1967 draft, this right was worth, collectively, $750,000.

---

[40]This assumes Blake's average valuation at $900,000 as the coin flip occurred on May 1, 1967, some 5 months after Seattle entered the NBA.

In an attempt to confirm the reasonableness of the above player rights valuations, Axelson, Blake, and Richman also valued the rights to specific players selected by petitioner. As we have previously stated, the statutory notice allocated $450,000 to the right to participate in the special expansion draft and the 1967 annual college draft. The $450,000 was specifically allocated among the 12 players on the Sonics' 1967–68 active roster, based upon a ratio of salaries paid to the players, with $328,005 and $121,995 being allocated to veterans and rookies, respectively. Although in some instances petitioner's experts testified to values for specific players greater than those assigned by respondent in the notice of deficiency, petitioner on brief uses respondent's values for six of the veterans that signed with the Sonics. Also petitioner on brief assigns a minimal value of $1,000 to three other veterans stating that "an opportunity to look over and negotiate with veteran players who have [previously] made the roster of NBA teams is at least worth the waiver price even though they did not sign with the Sonics." Furthermore, the notice of deficiency implicitly allowed a $1,000 basis to the veteran selected in the 1967 draft, placed on waivers, and acquired by another NBA team for the $1,000 waiver price. We agree with petitioner that a $1,000 allocation of basis to each of these latter four veterans (the three "looked-over" plus the one put on waivers) is appropriate.

Therefore, petitioner asserts that the statutory notice erroneously valued only three of the nine veterans who made the 1967–68 team, and that two of the six veterans who did not sign with the Sonics had more than a $1,000 nominal value. The most flagrant undervaluation, petitioner contends, was respondent's assignment of $49,995 to Walt Hazzard, also known as Mahdi Abdul Rahman. Hazzard, a guard, had played 3 years prior to being placed in the expansion pool, was a first round draft choice of the L.A. Lakers, the most valuable player in the NCAA finals, and a star player on the U.S. Olympic team. Blake valued Hazzard at $300,000, Axelson valued him at $400,000, and Richman valued him at $500,000. The Sonics insured Hazzard for $300,000. During the 1967–68 year, Hazzard averaged 24 points per game (seventh highest in the NBA), averaged 34 minutes playing time, and 6.2 assists per game (fifth highest in the NBA). Following the season, he was traded to Atlanta, whose general manager was Blake, even-up for Lenny Wilkens, the

runner-up in voting for the most valuable player award for that season.

Petitioner submits that the second veteran respondent undervalued at $69,975 was Tom Meschery. Blake placed a $100,000 price tag on him; Axelson, $150,000; and Richman, $300,000. The Sonics obtained insurance on Meschery in the amount of $300,000. For the 1967–68 season, Meschery played in all 82 games for the Sonics leading the team in minutes played (2,857) and rebounds (840). He averaged 14.5 points per game, fifth best on the team.

The third veteran on the Sonics 1967–68 active roster that petitioner contends was undervalued by respondent, at $26,010, was George Wilson, a center or a forward. Wilson's 1967–68 playing statistics are unremarkable. Blake valued Wilson at $75,000; Axelson at $100,000; and Richman at $50,000. The Sonics insured Wilson initially for $100,000 and then increased the coverage to $150,000.

Additionally, petitioner argues that the right to negotiate with two of the six veterans, Richie Guerin and Ron Reed who did not sign with the Sonics, and to prohibit them from playing for another NBA team without the Sonics' consent, had more than a $1,000 nominal value to petitioner. In 1967, Guerin was the player-coach of the St. Louis Hawks, and its general manager at that time, Blake, valued the rights to Guerin at $25,000. The Hawks at a later date reacquired Guerin's playing rights and reactivated him on their roster. Axelson believed Guerin was worth $100,000, and Richman, knowing that Guerin would never play for the Sonics, placed a $30,000 value on him.

Finally, petitioner contends the evidence herein establishes that the rights to Ron Reed had substantial value. Reed also played major league baseball and although Richman knew, after Reed was selected in the draft, that he was going to play only baseball, he felt there was a possibility he might return to basketball and retained Reed's residual rights. Blake valued his rights at $50,000, while Axelson valued the rights at $25,000.

Respondent's principal witness was an economist who made no pretense at being an expert in evaluating the playing ability of the draftees. Rather, he relied on an esoteric combination of variables (salary, playing time, rebounds, points scored, NBA all-star game participation, age, college draft round, etc.) to arrive at a value of $60,000 for the 15 players selected by petitioner in

the expansion draft. With all due respect to the witness as an economist, we find that bottom line figure ridiculous. We disregard it entirely.

However, we also have significant problems with the valuation evidence presented by petitioner's three experts. Petitioner, on brief, refers to Richman as "an admitted optimist" and substantially discounts his testimony. So do we. Axelson's NBA experience began in April of 1969, over 2 years after Seattle was granted an NBA franchise. Prior to 1969, he was associated with the National Association of Intercollegiate Athletics and the Bowling Proprietors Association of America. His exposure in 1966–67 to the professional play of players placed in the expansion pool was minimal. While his testimony is relevant we can give it little weight.

Insofar as the issue at hand is concerned, Blake's credentials are more impressive. His 17-year tenure, from 1954 to 1971, as general manager of the Hawks certainly qualifies him as an expert, and in his managerial capacity he has engaged in the same type of judgments and decisions with respect to players that are involved in the instant case. He currently runs an independent scouting business and is employed by most of the NBA teams. Also, he has prepared several valuation reports after the sale of an NBA franchise, in order to help the buyer assign values to the acquired assets. While we do not agree with respondent that Blake's current occupation totally discredits his testimony, we must view that testimony in light of the fact that his occupation gives him, naturally enough, a substantial interest in the outcome of this case. We do find his assigned values excessive although his testimony indicates his substantial knowledge of the sport in the front as well as the backroom.[41]

As we have said, petitioner has called our attention to the fact that the NBA disaster plan assigned a $50,000 price to the right to select the number six player on each team's roster. However, we do not believe that fact is in any way indicative of the appropriate values for the right to select a team's number 10th and 11th players. Obviously, there is a significant difference in the talent levels of a team's 6th, 8th, 10th, and 11th players.[42]

---

[41]In this respect we note that Blake stated that Klein and Schulman paid $450,000 more than the franchise and the players were worth.

[42]Also, we reject petitioner's contention that the merger negotiations between the NBA and ABA can be used to value its 1967 veteran expansion rights. With the exception of the veteran's expansion

We are also conscious of the testimony of Dr. Robert Nathan, a well-known economist, that one of the methods of determining an asset's market value is the prudent investor approach wherein a prudent investor, when purchasing depreciable assets, would seek to recover over the useful life of the assets the purchase price plus a reasonable rate of return. With respect to nondepreciable assets, the prudent investor expects only a reasonable rate of return. Both Schulman and Klein recognized that their investment in the Sonics would not, at the outset, show substantial annual operating profits, but they did expect that their equity value, over the years, would increase. We do not find their business attitude unique as many businesses, including various types of sports franchises, are purchased for their investment potential with a minimal view to short-term income.[43] Nevertheless, Nathan's testimony weighs heavily upon petitioner's purported player allocation of $1 million or more.

As must be apparent from the foregoing discussion, we have given careful consideration to the values attributed to the players by the various experts. Obviously, these veteran players had a substantial value to the new-born franchise. Their availability must have been an important consideration to Schulman and Klein. A team composed of free agents would have been a competitive disaster with adverse results on the franchise's revenues for its early years of operation.

Furthermore, as the Sonics were starting from ground zero without any players, with the commitment to field a team, and with the desire to have the team as competitive as possible, it is entirely understandable that the veterans selected were more valuable to the petitioner than to their former teams who were, at most, losing their number eight players.

Petitioner acknowledges that our decision should be determined on the basis of the facts known or reasonably anticipated in January 1967.[44] A hindsight analysis based upon evidence

draft, all rights received by petitioner in 1967 were to be received by each ABA team. However, we believe there were too many indeterminable elements in the NBA–ABA negotiations that are not comparable to petitioner's 1967 situation. For example, the record does not indicate the value of: Rick Barry's return to the NBA, the dismissal of the ABA's antitrust lawsuit against the NBA, the substantial increase in the popularity of professional basketball in the late 1960's and early 1970's and the upheaval of what was once a solid legal foundation that had previously created a predictable and stable environment for, not only the NBA, but also other professional major league sports franchises.

[43]It has been said that, unique to the purchase of a sports franchise, is what is known as an "ego factor."

[44]In January 1967, petitioner purchased the right to select unspecified players at a later date with

relating to individual valuations of the specific veterans selected was presented by petitioner only to confirm the reasonableness of our decision. However, we decline to engaged in individual valuations of each player. The record repeatedly shows that the expansion draft would, and did, provide petitioner with two or three good NBA veteran players, or a nucleus around which to build its team. The law is well settled that valuation of assets is a factual finding and is of necessity an approximation. *Anderson v. Commissioner*, 250 F.2d 242, 249 (5th Cir. 1957).

Yet before reaching a final number for these players we cannot help but relate their value to the total $1,750,000 package. What portion of the total assets purchased should be assigned to them? In making this evaluation it seems apparent that the principal right that petitioner was buying was the permanent right to play its partners, to use Mr. Kennedy's phrase, in a monopolistic situation. Secondarily, and giving further substance to that right, was the prerogative purchased by petitioner to participate in a college draft structure which provided for an inverse order of drafting, thus offering the possibility of maintaining a consistently competitive team. While, as found, other rights had a significant determinable value, it can be fairly said that on these two rights hang all the rest. These are the rights which give the franchise its long-term value, and to which the major portion of the purchase price must be attributed.

Clearly, we are presented with a difficult task, but, after careful study of a record consisting of 1,700 pages of testimony and over 200 exhibits, we hold that it amply and reasonably supports a finding that of the $1.75 million purchase price a fair market value of $500,000 is allocable to expansion player rights.[45] Sec. 1.167(a)–5, Income Tax Regs.

(c) *Further support for inapplicability of mass asset*

---

no reasonable assurance that the players selected would sign with the Sonics. For example Meschery, prior to being selected by Seattle, announced his retirement and an intention to enlist in the Peace Corps. Thus, conceptually, selection rights to 15 unspecified players could be worth more or less than the respective 15 players' rights.

[45] We leave for the Rule 155 computation allocation of this amount among the 15 veterans. We believe that a $1,000 basis should be allocated to each of the six veterans who did not sign with the Sonics. Although allocation in the notice of deficiency with respect to the Sonics' 1967–68 active roster was based upon 1967–68 salaries, we note that all but one of the veterans that signed with the Sonics had a 1 year contract with their former teams. Thus, their 1967–68 salaries could have been based, in part, upon the veterans' 1966–67 performances and not upon their current values to the Sonics. Accordingly, their 1967–68 performance records or, in turn, 1968–69 salaries might be considered.

*theory.*—We believe that the foregoing discussion, in which we have detailed our reasons for attributing a definite life and a substantial value to two of the rights purchased (and hence their amortizable nature), demonstrates the heart of our holding that the mass asset theory is not applicable to the instant case. A comment here on respondent's argument, that acquisition of an NBA franchise carried with it a substantial amount of goodwill and gave an expansion team a "ready-made" audience, is appropriate. Certainly an NBA franchise grant contained a valuable element of goodwill. However, it had to be assumed that petitioner's principal source of revenue during its early years would be from home box office receipts, it having no right to share in the gate while on the road. Only through the efforts of petitioner's management was it able to build a financially successful enterprise in Seattle. Furthermore "The acquisition of an asset or service that will attract customers is not goodwill. * * * Nor does a contract to acquire such assets or services constitute goodwill." *Indiana Broadcasting Corp. v. Commissioner*, 41 T.C. 793, 807 (1964), revd. on other grounds 350 F.2d 580 (7th Cir. 1965), cert. denied 382 U.S. 1027 (1966). Production assets such as player contract rights are a significant means to attract customers, now and in the future, and should not be considered goodwill. Cf. *Computing & Software, Inc. v. Commissioner, supra* at 233.

There is additional support for our view that the mass asset theory should not be invoked. The Fifth Circuit in *Laird v. United States*, 556 F.2d 1224 (5th Cir. 1977), affg. 391 F. Supp. 656 (N.D. Ga. 1975), cert. denied 434 U.S. 1014 (1978), found the theory inapplicable to the purchase of a professional football expansion franchise, the Atlanta Falcons, with the rights, among others, to participate in a special expansion veteran draft and college draft. Upon a record that is not materially distinguishable on this point from the facts of the instant case, the Fifth Circuit held, in part, that the taxpayer did not acquire an inextricably intertwined bundle of rights and that the player contract rights had a separate value of their own, amortizable over a limited useful life of 5.25 years. See also *KFOX, Inc. v. United States*, 510 F.2d 1365 (Ct. Cl. 1975).

Moreover, while certainly not conclusive, we note that the Tax Reform Act of 1976 added section 1056, Basis Limitation for Player Contracts Transferred in Connection with the Sale of a

Franchise, effective for franchises acquired after December 31, 1975. Under section 1056(d) the maximum amount that may be allocated to player contracts is 50 percent of the consideration for the transfer of franchise unless the transferee can satisfy the Secretary that an allocation in excess of 50 percent is proper under the circumstances. The Senate Finance Committee Report thereto provides that this provision shall apply in the case of the sale or exchange of a sports franchise or the creation of a new franchise. Noting that Rev. Rul. 67–379, 1967–2 C.B. 127, and Rev. Rul. 71–137, 1971–1 C.B. 104, stated the Commissioner's position that the cost of a player contract must be capitalized and depreciated over the useful life of the contract, the Committee stated:

There is no specific rule under present law relating to the allocation of a portion of the total consideration paid to acquire a franchise, players' contracts and other assets which might be acquired at the time of acquisition of a franchise. Generally, this allocation is made on the basis of the fair market values (or relative fair market values) of the various assets. The allocation to players' contracts is also necessary when a new franchise is acquired through the expansion of an existing league or the formation of a new league. [S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 125–126.]

Thus, Congress gave its imprimatur to the possibility of a substantial portion of a franchise price being allocated to player contracts.

### 2. *Amortizable Nature of Other Franchise Rights*

We do not find the other franchise rights to share the amortizable quality of the cost of participating in the 1968–69 NBA expansion and the veteran draft.

(a) *Right to participate in 1969 and subsequent college drafts.* Thus, we do not agree with petitioner that the right to participate in the 1967 college draft is a separately identifiable right with respect to life and cost. We do not see any rational basis for distinguishing that year's college draft from the college drafts of ensuing years. College drafts cannot be separately valued as they emanate from the Sonics' nonamortizable franchise rights. Obviously petitioner had no team record the preceding season so that its place in the inverse-to-standing order of drafting had to be spelled out. But we view this as a relative detail to its basic right to participate in the draft with its fellow joint venturers. Finally, assuming as we do that

petitioner had a right to draft at least last on each round, no evidence was presented with respect to the value of drafting 6th as distinguished from 12th.

(b) *Modification in holding due to statutory notice.*—As previously set forth, the statutory notice of deficiency stated that "the amount allocable to the right to participate in a special Expansion Draft and in the Annual College Draft for 1967 did not exceed $450,000.00." The $450,000 was then allocated to veterans and rookies on the 1967 roster in the amounts of $328,005 and $121,995, respectively, and amortized over a 5-year useful life. When a specific 1967 veteran or rookie was sold or selected in a subsequent expansion draft, the player's remaining unamortized basis, adjusted basis, was applied against the amount realized to compute gain or loss recognized. By amendment to petition, petitioner alleged that "The Commissioner erred in determining that the cost of players stated in the expansion agreement (agreement) of January 24, 1967, wherein petitioner's predecessor acquired players from the then existing members of the National Basketball Association (NBA), was not $1,600,000 (including imputed interest) as stated in such agreement." Thus petitioner did not plead and put into issue respondent's allocation of $121,995 to the 1967 college draftees. Moreover, respondent's amendment to answer alleged, in part that, "None of the total amount paid by petitioner, $1,750,000 * * * is properly allocable to intangible property or rights which qualify" for an amortization deduction as petitioner purchased "a mass of indivisible intangible assets for a lump-sum price." Further, respondent alleged that in the event we determine to the contrary, then "the amount qualifying for amortization does not exceed $450,000 as set forth in the notice of deficiency." Respondent in his prayer for relief stated:

(2) That the Court redetermine the deficiencies for the taxable years ending May 31, 1969 and May 31, 1970, to include an increased deficiency of $43,794.21 and $35,504.11, respectively, as set forth in paragraph 7 [the allegation concerning this new mass asset theory] claim for which is hereby made pursuant to the provisions of *Code* sec. 6214(a).

We have held that the mass asset theory is inapplicable herein. We have also given our view that no amount is properly allocable to the 1967 college draftees. However, as we repeated above, respondent in his pleadings has not altered his original determination that, even if the mass asset theory does not apply,

no more than $450,000 is allocable to the expansion draft players and the 1967 college draftees. Of this $450,000, respondent allocated $121,995 to the college draft players. We may not in this decision adjudge deficiencies greater than those asserted in the notice. Sec. 6214(a); *Moise v. Burnet,* 52 F.2d 1071, 1073 (9th Cir. 1931); *Koufman v. Commissioner,* 69 T.C. 473 (1977). Accordingly, to the extent that our holding of no allocation to the 1967 college draft rights increases the deficiencies for the years in issue above those asserted in the pleadings, petitioner is allowed the basis allocations attributable to the college draftees as provided in the statutory notice.[46]

(c) *National TV contract.*—Returning to the issues at hand we would sweep into the valuable, but nonamortizable, category of rights, the TV contract prospects. When the Sonics joined the NBA, a contract existed between the NBA and ABC wherein ABC was granted the sole and exclusive worldwide television broadcast rights to NBA games for the 1965–66 and 1966–67 seasons. Additionally, ABC had three consecutive options to telecast NBA games for the 1967–68, 1968–69, and 1969–70 seasons, each option to be exercised no later than February 28 of each respective year. ABC also had a right of first refusal for the 1970–71 season. In January 1967, ABC had not exercised its renewal option for the 1967–68 season. Petitioner submits that the record, including the testimony of both Kennedy and Frank Mieuli (a member of the NBA television committee) to wit, that NBC and CBS were not interested in the NBA and that they were afraid ABC would not pick up the option, shows that in January 1967 the likelihood of continued television revenues was highly uncertain. Therefore little, if any, of the purchase price should be allocated to the acquisition right to share in national television revenue. We disagree.

While there was no certainty the NBA would continue, after 1967, to have a favorable national television contract, the record indicates that there was a reasonable expectation of such a contract after 1967 and in future years, and that each member team would receive, at a minimum, some $100,000 per year.

---

[46]On this point we note respondent, on reply brief, states that two of the three 1967 college draftees (one was waived in 1969 and the other traded "even-up" for another player who was subsequently sold) will have no separate basis if we determine the mass asset theory applicable. "If the Court rejects that position, then the petitioner has the burden of showing that the basis of each player at the time of his disposition by petitioner was in excess of the amount allowed in the statutory notice."

Although the picture was bleak from 1962 through 1964, by 1967 it was much brighter. The overall popularity of the NBA was steadily growing. Gross gate receipts had increased from 1964 to 1967 ($3.9 million to $7.9 million). Also in 1966 the NBA embarked on a 4-year, 8-team expansion program and hoped within 10 years to grow from 9 to 24 teams. The addition of more franchises throughout the country would strengthen the NBA's position for a more substantial monetary national television contract and, in turn, national television would develop ready-made audiences for new expansion teams. In short, a sport cannot be "major league" without national television, and in 1967 continued national television exposure was reasonably certain.

Moreover, petitioner's own projected financial statements submitted in 1967 to Peoples Bank, showing its national television revenue at a base for a 6-year period of $100,000 per year, further illustrate petitioner's reasonable expectation of a continuing national television contract.[47]

We hold that the rights under the ABC contract were only a link in a continuing chain of national television income. Such rights would last as long as Seattle held an NBA franchise and the source of these rights was its NBA membership. The NBA negotiated the television contract for all of its members and all franchises shared equally in the revenue, regardless of their league standing or gate receipts. The ABC contract only provides a measure of valuation for the acquired right to NBA national television revenue. Such rights continue indefinitely and therefore cannot be amortized. Thus, although we find the record conclusively establishes said rights to have significant value, in light of their nonwasting character, we find it unnecessary to our decision and decline to determine a specific valuation. See *Laird v. United States, supra.*

---

[47]Furthermore, petitioner's contention that even in 1968 television revenues were so uncertain that bankers of the Baltimore team would not accept them as collateral for an overdue loan is without merit. "There are many considerations, other than * * * [value] which might prompt conservative business minds to refuse * * * [an item] as collateral." *Anthony P. Miller, Inc. v. Commissioner,* 7 T.C. 729, 746 (1946), affd. 164 F.2d 268 (3d Cir. 1947); *Royal Packing Co. v. Lucas,* 38 F.2d 180 (9th Cir. 1930). Additionally, petitioner contends that the television contract required NBA teams to (1) provide suitable space and locations for television crews, (2) provide electrical power, (3) abstain from advertising over the public address system before, during, and after a game, and (4) play games at times suitable to ABC to fit into their broadcast schedule. These conditions constituted a considerable burden on a team and thus substantially reduced the net value of national television income to a reasonable investor. This argument is clearly without merit.

(d) *Other franchise rights.*—Furthermore both parties agree that the other rights petitioner acquired upon grant of an NBA franchise cannot be depreciated or amortized. Therefore, for purposes of this decision, it is unnecessary to determine the allocable portion of the purchase price attributable thereto.

### 3. *Treatment of Post–1968–69 Expansion Proceeds*

The final issue is the treatment of post–1968–69 expansion proceeds. Petitioner contends on brief that, when it acquired its NBA franchise in 1967, it became an equal one-twelfth member in a joint venture, the NBA, which for tax purposes is a partnership. Subsequent expansions of the NBA in 1968 and 1970, granting franchises to Cleveland, Phoenix, Milwaukee, Portland, and Buffalo, were under arrangements substantially identical (except with respect to time and amount) to those granted the Sonics. Therefore, through 1970, petitioner's partnership interest decreased from a one-twelfth to a one-seventeenth interest as it, along with the other then-existing NBA franchises, sold a portion of its assets previously acquired under its grant, i.e., a share of its national television revenue, playoff proceeds, college draft rights, etc. Accordingly, petitioner submits that it should be permitted to deduct a proportionate share of its adjusted basis in such assets sold to the newly admitted franchises along with the adjusted basis of its players selected in the 1968 and 1970 veteran expansion drafts.

Respondent replies that for an initial capital contribution, petitioner, as well as the subsequent expansion teams, became a member of a joint venture. The admission of a new partner, which necessarily involves the readjustment of existing partners' shares of profits and losses, does not constitute the sale or exchange of existing partners' partnership interests. *Cameron v. Commissioner*, 8 B.T.A. 120, 125 (1927), affd. 56 F.2d 1021 (3d Cir. 1932). What petitioner did, in fact, was to purchase from the other NBA teams a new NBA franchise which is a separate and distinct capital asset from the team's interest in the joint venture operation.

We again note that respondent's amended answer states that, in the event we find his mass asset theory inapplicable, we should turn to the notice of deficiency wherein it is provided that proceeds received (less imputed interest thereon) from subsequent expansions constitute long-term capital gain, reduced only

by the adjusted basis attributable to petitioner's players selected by the new expansion clubs, subject to recapture under section 1245. This approach is consistent with his Rev. Rul. 71–123, 1971– 1 C.B. 227, relating to the creation of an expansion professional football franchise. Clearly, under this theory and under section 1222(3)[48] a "sale or exchange of a capital asset held for more than 6 months" must have occurred upon subsequent NBA expansion. Obviously petitioner does not contest the capital gain nature of any recognized profit. Thus, we are not faced with an issue whether the petitioner made a purchase in 1967 or received the proceeds of a sale upon the granting of additional expansion franchises. We take as a "given" that a sale occurred, and therefore we must consider the question whether petitioner has any basis that it can offset against the receipts. Under the circumstances, we do not consider the possible question whether there was, in fact, a disposition of a portion of a capital asset by reason of the addition of an expansion team to the NBA.

In considering the basis problem, it is appropriate to reexamine the relationship of petitioner's franchise to the NBA, and for this we turn to the relevant documents in evidence.

The critical agreement of January 24, 1967, provided that 10 listed teams, known as "grantors," were willing to grant to the petitioner a franchise for the operation of a basketball team representing Seattle in the National Basketball Association and "for the purposes of joining the joint venture presently in existence among the Grantors." In addition to the payment of $1,750,000, the petitioner agreed to be bound by the constitution and bylaws of the association. The agreement also stated that the petitioner was simultaneously executing "a counterpart of, and becoming a party to, the Joint Venture Agreement among the Grantors entered into as of June 1, 1966."

The aforenoted joint venture agreement provided at its outset that the parties to it are "Joint Venturers in a joint venture conducted under the name of the National Basketball Associa-

---

[48]SEC. 1222. OTHER TERMS RELATING TO CAPITAL GAINS AND LOSSES.
For purposes of this subtitle—

    *        *        *        *        *        *        *

(3) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months [9 months for taxable years beginning in 1977; 1 year for taxable years beginning after December 31, 1977], if and to the extent that such gain is taken into account in computing gross income.

tion." The joint venture is to consist of professional basketball teams each of which shall be operated by a joint venturer. Its affairs are to be conducted in accordance with this agreement and the constitution and bylaws of the joint venture. Each joint venturer is required to contribute such capital as set forth in the constitution.

The constitution requires a fixed capital contribution of $6,000 plus an annual contribution of 6 percent of the gross gate receipts or $15,000, whichever is greater. The constitution also spells out the details of the structure of the National Basketball Association, and the rights and responsibilities of each franchise holder. The bylaws set forth the details of the manner in which the association is to operate.

A Federal partnership return of income, Form 1065, was filed under the name "National Basketball Association (Joint Venture)." For the fiscal year ended May 31, 1968, the joint venture reported total income of $16,818.21 (royalties of $1,869.03 from Wilson Athletic Goods Manufacturing Co. and $14,949.18 in fines) and total deductions of $606,302.12 for a net loss of $589,483.91. The loss allocable to each partner ranged from a high of $106,320.71 to a low of $23,942.98. The returns in evidence for the other partnerships' years do not vary in relevant substance from the 1968 year except that the losses grew progressively larger.[49]

It seems clear from the foregoing documents that the "grantors," each an owner of a professional basketball franchise, chose the joint venture arrangement as a means to give some structure to a professional basketball league and its operations. It was organized to operate a professional sports league, oversee its super structure, and maintain, in an orderly manner, the exhibition of basketball among its competing members. That there would be a commonality of problems among the franchises is obvious. Without a means to resolve these mutal problems, an indiviudal franchise could not hope to be financially successful.

There had to be an agreement on the drafting of players, player contracts, disciplining of players, enforcement of constitution and bylaws with respect to individual franchises, scheduling of regular season games, arrangement of playoff and all-

---

[49]The partnership losses reported by petitioner have not been challenged by the respondent.

star games, and a multiplicity of other internal matters. Further, there had to be a centralized authority for dealing with outsiders on such matters as national TV contract and NBA promotional and merchandising activities.

However, as the partnership returns reflect, the financial aspects of the joint venture—the NBA—were kept to a minimum commensurate with its operational functions. True, the NBA collected the receipts from the playoff and all-star games, but only as the agent for the franchise holders in distributing the net proceeds to them. We note that the question on the partnership forms, "principal product or service," is answered "Basketball League Admin." The franchise holder surrendered only so much authority to the joint venture as to give the NBA a structure pursuant to which decisions, designed to make ownership of a franchise more profitable, could be made. With the exception of the losses incurred in administering the league there was no sharing of profits or losses among the members.

As previously footnoted, respondent has not challenged the joint venture losses reported by petitioner. Assuming the organization is a joint venture for Federal income tax purposes, section 761(a) provides that the term "partnership" includes a joint venture and, therefore, the tax consequences of a transaction involving the joint venture must be determined under subchapter K—Partners and Partnerships. As we have discussed, the functions of the joint venture were kept to a minimum commensurate with its administrative operations. Upon league expansion, the new franchise was required to make a modest $6,000 capital contribution to the joint venture in exchange for an interest in the venture and, under section 721, no gain or loss was recognized by the new franchise or the joint venture. Any other consideration paid by an expansion franchise was not for an interest in the joint venture, but for other property rights discussed *infra*. Accordingly, the tax consequences of this consideration to the existing "grantors" and new expansion franchises are excluded from the application of subchapter K.

We view the petitioner as being in a unique dual role as (1) a member of a joint venture for purposes of participation in a professional basketball league, and (2) an independent business entity with full responsibility for its own profits and losses.

Petitioner paid $1,750,000 to the 10 franchise holders (1) for the right to operate, on an equal basis, an NBA franchise and (2) the right to select 15 veteran players from the grantors in the manner prescribed in the January 1967 agreement. We need not decide whether the NBA, as a professional sports league, was owned by the joint venturers equally but outside its partnership arrangement, or as tenants in common. The only relevant determination for purposes of this case is that the ownership of the NBA, a property right, was not a partnership asset.

We have found that a dollar value can be assigned to the right to purchase 15 players and the right, flowing from its status as an equal member, to participate in any 1968 league expansion. Therefore, the balance ($1 million of the $1,750,000 was paid for the remaining equal rights included in (1) above.

We have said that the most important right possessed by petitioner is the right to play its fellow joint venturers. The second most important right is the right to particpate in the college draft, leading to exclusive NBA bargaining rights with the selected players, and thereby giving petitioner an opportunity to field a competitive team. Generally, the greater the artistic success of a team on the court, the larger the gate receipts and local TV and radio proceeds. Clearly, then, these two rights, along with the expansion veteran player rights, generate almost all of an expansion franchise's income.

Exclusive territorial rights, in and of themselves, do not generate income. Certainly, in the NBA and other sports leagues, amateur and professional, the home court or field produces an advantage in economic gain as well as an artistic success. However, without an opposing team to play the game with, these local rights are de minimis.

We have found that each new expansion franchise was granted exclusive territorial rights. Moreover, we have previously found that in 1966 the NBA board of governors had conducted a market study with respect to the best prospective cities for locating new franchises under its 4-year, eight-team expansion program. In 1966, the NBA was already established in 10 local markets, i.e., cities. Certainly, expansion franchises would be granted only to cities where the board believed they would be financially successful. New successful expansion franchises were the insurance for the continued growth and success of the league. Conversely, expansion franchises would not be granted

to locales that appeared unprofitable. Accordingly, although the price for an expansion franchise increased from 1966 through 1974, the price paid by two or more teams in any one expansion year was identical. This increase in the price paid to acquire an NBA expansion franchise was attributable to the steadily increasing value of an interest in the NBA. It did not represent a difference in the values of different territories.

In sum, by purchasing a franchise with the concomitant right and obligation to join the joint venture, petitioner was the instant beneficiary of the national goodwill that had been developed by the NBA. It was afforded the opportunity to profit by that goodwill in the Northwest and the chance to further it for its fellow venturers' benefit. Increased national TV proceeds and gate receipts from play off and all-star games were the prospective reward—and that did, in fact, occur.

Therefore, petitioner paid $1 million (leaving aside the adjustments required under the statutory notice) for what might be labeled the basic nonterminable rights belonging to an NBA franchise holder. Petitioner could rely upon those rights in operating its basketball team for its own profit. It owned a property right for $1 million and under section 1012, that amount was its basis. Upon subsequent expansions the new franchises acquired an equal share of the aforenoted property right. Consequently, we do not see how respondent can concede the fact of a sale of an interest in property and, at the same time, deny a basis attributable to the cost of its acquisition. Solely by reason of a $1 million expenditure, petitioner was entitled to share in the 1969 and subsequent expansion proceeds, if any. We reject respondent's no-basis contention. Cf. *Gamble v. Commissioner*, 68 T.C. 800, 821 (1977).

We know that gain realized on the sale or exchange of property, tangible or intangible, shall be the excess of the amount realized over the adjusted basis for the property transferred. Sec. 1001(a). "When a part of a larger property is sold, the cost or other basis of the entire property shall be equitably apportioned among the several parts, and the gain realized or loss sustained on the part of the entire property sold is the difference between the selling price and the cost or other basis allocated to such part." Sec. 1.61–6(a), Income Tax Regs.; *Moberg v. Commissioner*, 35 T.C. 773, 786 (1961), revd. in part and affd. in part 310 F.2d 782 (9th Cir. 1962). Accordingly

petitioner is entitled to reduce its amount realized upon 1970 expansion by $176,450.59[50]

### 4. *Treatment of Gain Realized by Petitioner on Sale of Players to Subsequent Expansion Franchises*

Furthermore, for the 1968 and 1970 expansions, a portion of the expansion proceeds received by petitioner should be allocated to the Sonics' players selected by the expansion teams. Gain realized thereon is section 1231 gain and subject to recapture under section 1245. The record does not indicate and therefore we are unable to determine the value, in 1968 and 1970, of the Sonics' players selected in the expansion drafts. Hopefully, the parties will be able to agree upon the amount of section 1245 gain attributable to the players selected in the draft.

Obviously, some of the college draftees lost by the petitioner in an expansion draft may have achieved, independently, a tax basis by reason of the payment of a bonus, cost of purchasing the player's contract, etc. We do not mean to exclude such basis from any computation growing out of the receipt of expansion proceeds.

However, we cannot apply, without variation, this concept to the instant case because of respondent's concession in his statutory notice assigning a portion of the $1,750,000 as a basis allocable to the college draft players. Thus, under the statutory notice, certain college draft players must be deemed to have that basis, and under this opinion we have set the groundwork for a basis to be assigned to each expansion draft player.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

WILBUR, *J.*, dissenting: The majority opinion, after correctly rejecting respondent's mass asset theory, accepts respondent's concession that the expansion proceeds are taxable as capital gains. The majority states:

In the circumstances, we do not consider the possible question whether there

---

[50]$(1/_{14}-1/_{17} \div 1/_{14}) \times \$1,000,000$. The addition of Buffalo, Cleveland, and Portland in 1970 took the NBA from a 14-team league to a 17-team league.

was, in fact, a disposition of a portion of a capital asset by reason of the addition of an expansion team to the NBA.

Despite this disclaimer, the majority deals with the basis issue by assuming that the league expansion involved the disposition of a capital asset (that is, of a proportionate part of each franchise). This is done by permitting petitioner to reduce the expansion income by the cost of the asset "sold" (a proportionate cost of its *entire* franchise). I must dissent from this treatment.

Over the 8-year period from 1966–74, nine new franchises developed by the efforts of the members yielded total expansion proceeds of over $26 million—and this does not include the subsequent expansion to include several ABA teams. This $26 million did not arise from the "sale" of a portion of each of the existing member's franchises. The proceeds arise from the development efforts of the members to maximize profits, to use Commissioner Walter Kennedy's phrase, in a monopolistic situation. As the majority tells us "new successful expansion franchises were the insurance for the continued growth and success of the league."

All of the expansion income arises from these efforts by the owners to develop their business rather than from the sale of a part of their franchises, *for they still have their franchises*. This can easily be seen by looking at what petitioner had before and after the expansion. As the majority explains:

> We have said that the most important right possessed by petitioner is the right to play its fellow joint venturers. The second most important right is the right to participate in the college draft, leading to exclusive NBA bargaining rights with the selected players, and thereby giving petitioner an opportunity to field a competitive team. Generally, the greater the artistic success of a team on the court, the larger the gate receipts and local TV and radio proceeds. Clearly, then, these two rights, along with the expansion veteran player rights, generate almost all of an expansion franchise's income [*Supra* at 866.]

"On these two rights hang all the rest," the majority notes, adding in the quote above that "these two rights, along with the expansion player rights, generate almost all of the expansion franchise income."

Each expansion enhanced these two rights; and the members possessed these two rights *both before and after* the expansion. The first and most important of these two rights, according to

the majority, "is the right [of petitioner] to play its fellow joint venturers."[1] But it is clear that *no part* of this particular right was sold when a new team, such as Phoenix, entered the league. Seattle plays *exactly the same* number of home games and away games, although against a greater variety of opponents.[2] The majority's findings of fact contain Seattle's won-lost record for the season 1967–68 through 1970–71, showing the number of games played (half of them at home, the other half away):

| Season | Total regular season games | Won | Lost |
|--------|----------------------------|-----|------|
| 1967–68 | 82 | 23 | 59 |
| 1968–69 | 82 | 30 | 52 |
| 1969–70 | 82 | 36 | 46 |
| 1970–71 | 82 | 38 | 44 |

Thus the majority opinion makes it crystal clear that this most important of the two rights, "on which all the rest hang," is retained intact. Yet they actually go on to allow the expansion proceeds to be reduced as though a portion of this right was sold. The only possible explanation for this extremely surprising result is this following statement by the majority:

> Exclusive territorial rights, in and of themselves, do not generate income. Certainly in the NBA, and other sports leagues, amateur and professional, the home court or field produces an advantage in economic gain as well as an artistic success. However, without an opposing team to play the game with, these local rights are de minimis.

Without an opposing team, there is no game, no gate receipts, no television (local or national), and no league. The rights are not de minimis—they are nonexistent. But this has absolutely nothing to do with the facts before us. Petitioner played 82 home games, both before and after the expansion. Of what relevance then is a discussion about a club "without an opposing team to play the game with"?

"The second and most important right" the majority continues, "is the right to participate in the college draft" because "the

---

[1]"It had to be assumed," the majority informs us, "that petitioner's principal source of revenue during its early years would be from home box office receipts, it having no right to share in the gate while on the road."

[2]Presumably this variety encourages regional rivalries, enhancing both home gate receipts and local television revenue. Certainly, introducing the NBA to the major cities of the Southwest is expected to increase substantially the value of a national television contract. (See *supra*).

greater the artistic success of a team on the court, the larger the gate receipts and local TV and radio proceeds." But the economic basis of this argument simply does not survive analysis. Draft rights have economic value only in the operation of an NBA franchise. The value of the right of each franchise to participate in the future college draft is not measurably diluted by careful expansion. After an expansion, the owners of an existing franchise retain player selection rights in the draft that are *as valuable to their franchise* as those they possessed before the expansion. It is true that the right to draft has value in enabling a team *vis-a-vis its competitors* to keep its player pool at a *relatively* comparable level of competence. It is principally through the relationship of the competence of its players to other NBA teams that the players add value to each franchise. When an additional team is added, so that 15 teams are drafting on each round rather than 14 teams, the relative competence of the players acquired in the draft by any one team *vis-a-vis* the competence of players acquired by any other team remains constant. Therefore, the value of the players drafted for exploiting the franchise rights do not diminish.

It may be true that if the league expanded too quickly the overall quality of the league would decline significantly (even though the competitive balance among the teams remains relatively constant), and the interest in professional basketball would decline and all the franchises would suffer. However, the measured increases through the years, given the increasing pool of fine talent, have not resulted in any discernible decline in talent. Indeed the majority opinion specifically finds (p. 832) that "there was a sufficient number of talented basketball players coming out of college to stock the teams as the expansion movement progressed without significant dilution of talented players on the then-existing teams."

It is clear that the value of the draft is attributable to the development efforts of the owners in running the business, the league. Does realizing the fruits of this development through increased sharing of its college draft rights, carefully calculated to avoid diminution of the overall talent pool and to maintain petitioner's talent pool relative to its competitors, diminish its monopolistic exploitation or simply provide a business means for its enhancement? It seems clear to me that this "second most

important right" (like the first one) was not diminished by expansion.

The basis attributable to these interests that were retained undiminished (indeed enhanced) cannot be allowed as a deduction from expansion income. According to the majority, these are the two most important rights "on which the others hang," since they (along with veteran player rights) "generate almost all of the expansion franchises income." Since these rights are retained intact, the majority is clearly wrong in allowing a deduction on the assumption that they were disposed of in part. This much is clear without more.

But there is more. For a similar comment may be made about local television and broadcast rights (the right to telecast local games not interfering with nationally telecast games). The findings of fact make clear that this was an important part of the local or territorial franchise rights, yielding $1 million during the first 5 years—more than one-half of the Sonics' television income during this period. These rights were also retained intact.

The majority also lists the right to play and exhibit NBA games within Seattle's 75-mile territorial radius, the right to exercise a monopoly franchise within that radius, and the right to exploit local goodwill. All these rights were clearly retained and to allow a deduction for part of the basis attributable to these rights makes no sense at all.[3]

Additionally, petitioner retained its right to share in receipts from a national television contract, the expansion being designed to enlarge those receipts. By adding Phoenix, Seattle, and other prime large city markets in the Northwest and Southwest, the overall interest in professional basketball increases, and the value of a national television contract (particularly if inter-network bidding can be stimulated) increases substantially. The majority opinion makes it clear that one of the main purposes of expansion was to enhance the value of a national television contract. Thus, while there will be additional participants dividing the proceeds of the contract as the result of expansion, it is anticipated in each instance that the increased revenues will more than offset them.

---

[3]Indeed, it is common knowledge that if an expansion team is allowed to encroach on these local or territorial rights, the specific team concerned is awarded compensation in addition to and distinct from the expansion proceeds shared by all of the members generally.

Expansion was a result of the development efforts of the NBA members in the ordinary course of their business. The $26 million realized from expansions over the 8-year period from 1966–74 (exclusive of subsequent expansions to include ABA teams) were generated by business operations, by the members exploiting their professional basketball monopoly. Respondent has decided which theories to pursue in this very complex case, and has conceded *for purposes of this case* that upon failure of his mass asset theory, the expansion income herein is taxable as a long-term capital gain. But he has not conceded that petitioner has parted with assets that entitle it to deduct a portion of its basis in the Seattle franchise. Given the growth in the professional sports—from box lacrosse to soccer—this is an important question.[4] The majority, based on the findings and discussions of its own opinion, has clearly decided it wrong.

RAUM, TANNENWALD, IRWIN, QUEALY, and HALL, *JJ.*, agree with this dissenting opinion.

---

[4] In view of the magnitude of the expansions in the NBA alone, the impact on the other NBA clubs will be significant. When other sports are considered, the potential impact of the decision is even greater.